T.C. Memo. 2010-238

UNITED STATES TAX COURT

DOROTHY R. DIEBOLD, TRANSFEREE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 24675-07.                Filed October 26, 2010.

<u>A. Duane Webber</u>, <u>Jaclyn Pampel</u>, <u>Catlin A. Urban</u>, <u>Summer Austin</u>, and <u>Ryan J. Kelly</u>, for petitioner.

<u>John R. Mikalchus</u>, <u>Frederick C. Mutter</u>, and <u>Jessica R. Browde</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  In a notice of liability respondent determined that Dorothy R. Diebold (petitioner) is liable as a transferee for the assessed Federal income tax liability of the

Double-D Ranch, Inc. (Double-D Ranch), for its short taxable year ending July 2, 1999. The issue for decision is whether petitioner is liable as a transferee pursuant to section 6901[1] for the unpaid tax and section 6662 accuracy-related penalty owed by Double-D Ranch for that taxable year. For the reasons stated herein, we find that petitioner is not liable as a transferee.

### FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulation of facts is incorporated herein by this reference. Petitioner resided in New York at the time she filed her petition.

Petitioner sold, in form, the stock of Double-D Ranch. The parties for the most part agree on the form of the transaction at issue but disagree as to its substance. Respondent argues that petitioner in substance sold the assets of Double-D Ranch and received a liquidating distribution of the proceeds. Petitioner contends that the substance of the transaction matches its form and the substance was a sale of stock.

Petitioner was married to A. Richard Diebold (Mr. Diebold). The Diebolds had three children: Diane D. Terni (Ms. Terni), A.

---

[1] All section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Richard Diebold, Jr. (Mr. Diebold, Jr.), and Dudley G. Diebold (Mr. D. Diebold).

Mr. Diebold died on June 18, 1996. Pursuant to a trust agreement dated July 29, 1985, the Dorothy R. Diebold Marital Trust (the marital trust) was created upon the death of Mr. Diebold on June 18, 1996. As sole beneficiary of the marital trust, petitioner was entitled to the net income of the marital trust in quarterly installments for the rest of her life. At the time of Mr. Diebold's death, the marital trust owned 3,835 shares of stock in Double-D. Ranch. The 3,835 shares comprised all of the issued and outstanding shares of Double-D Ranch. From the time of Mr. Diebold's death to the purported sale of Double-D Ranch's stock in 1999, the assets of Double-D Ranch consisted primarily of stock in American Home Products (AHP), a publicly traded company; stock in other publicly traded companies; U.S. Treasury securities; cash; and real estate. These assets will be discussed in more detail below.

The various securities and real estate had high fair market values, but low bases for tax purposes. If they were to be sold by Double-D Ranch, the corporation would be left with a large tax liability on the recognized gain.

The marital trust had three cotrustees: (1) Petitioner; (2) Bessemer Trust Co., N.A. (Bessemer Trust); and (3) Andrew W.

Bisset (Mr. Bisset). Bessemer Trust was a national bank that served as trustee, asset custodian, and investment adviser to the marital trust. Austin Power, Jr. (Mr. Power), a senior vice president at Bessemer Trust, served as counsel and account manager for both the marital trust and petitioner. Mr. Power was Bessemer Trust's representative in its role as trustee of the marital trust. Mr. Bisset is an attorney licensed to practice law in Connecticut and New York. He served in effect as petitioner's personal attorney after her husband's death and was involved in nearly all of petitioner's dealings.

Petitioner was also a director of the Diebold Foundation, Inc. (the Diebold Foundation), a section 501(c)(3) charitable organization. Mr. Bisset and petitioner's three children served as the other directors of the Diebold Foundation.

On May 28, 1999, approximately one-third of the outstanding stock of Double-D Ranch (1,280 shares) was transferred from the marital trust to The Diebold Foundation. Petitioner requested this transfer, and it was approved by Mr. Power and Bessemer Trust in their capacity as trustees of the marital trust.

On the marital trust's 1999 Form 1041, U.S. Income Tax Return for Estates and Trusts, Bessemer Trust, as cotrustee for the marital trust, prepared and filed with the Internal Revenue

Service (IRS) a statement identifying petitioner as the marital trust's "Grantor/Owner".

Decision To Sell Double-D Ranch

At some point in May or early June 1999, the cotrustees of the marital trust and the directors of the Diebold Foundation decided to sell the stock of Double-D Ranch. Mr. Power was primarily responsible for implementing the decision to sell the stock; Stephen A. Baxley (Mr. Baxley), a senior vice president in Bessemer Trust's tax department, Morton Grosz (Mr. Grosz), Richard Leder (Mr. Leder), and Adam Braverman assisted in the sale. Messrs. Grosz and Leder were attorneys at Chadbourne & Parke, LLP, a nationally known law firm.

The representatives for petitioner discussed a potential sale with two groups of purchasers: (1) James M. Rhodes (Mr. Rhodes), Harry Zelnick (Mr. Zelnick) of River Run Financial Advisors, L.L.C. (River Run), and Ari Bergmann of Sentinel Advisors, L.L.C. (Sentinel); and (2) Fortrend International, L.L.C. (Fortrend). River Run, Sentinel, and Fortrend all presented a similar interest: purchasing the stock of closely held corporations holding assets with high fair market values but low tax bases. After learning of these companies, petitioner's advisers decided to sell Double-D Ranch stock.

On June 1, 1999, petitioner's representatives met with Mr. Zelnick of River Run, Mr. Bergman of Sentinel, and separately, Craig Hoffman (Mr. Hoffman) of Fortrend, and ultimately decided to sell the Double-D Ranch stock to Sentinel. On or before June 9, 1999, Mr. Power, acting as the representative of Bessemer Trust, and Mr. Bisset concluded that the Double-D Ranch stock should be sold and recommended to petitioner and her children, in their various capacities, to approve the sale as well; all agreed. Shap Acquisition Corp. II (Shap II) was the entity created and designated to serve as the acquirer of the Double-D Ranch stock. Mr. Zelnick and Mr. Rhodes served as directors and officers of Shap II.

The Sale Transaction

Representatives for both the seller and the purchaser negotiated the price and drafted the transaction documents. On June 17, 1999, Shap II and the Double-D Ranch shareholders executed a letter of intent confirming the terms of the stock sale. The letter of intent was signed by Mr. Rhodes, Mr. Power, and Mr. Bisset, acting on behalf of Shap II, the marital trust, and The Diebold Foundation, respectively.

Attached to the letter of intent was a term sheet defining the terms of the sale. The term sheet reflected that Shap II[2] would purchase all issued and outstanding Double-D Ranch stock for cash in an amount equal to the fair market value of the corporation's assets minus an agreed-upon discount.

As discussed above, Double-D Ranch held mostly marketable securities and real estate. These assets were easily valued on various securities exchanges, and the term sheet indicated that was the preferred method for their valuation. However, one Double-D Ranch asset was more difficult to value--the AHP stock. Because Double-D Ranch owned such a large block of AHP stock, simply dumping it into the stock market would have an impact on the stock's value. Accordingly, the parties to the Double-D Ranch sale decided to value the AHP stock according to a formula. The price would be determined by taking the "Volume Weighted Average Price" for the 5 consecutive trading days before the closing. These five weighted prices would then themselves be averaged. The result would be the price given to the AHP stock owned by Double-D Ranch.

_____

[2]The letter of intent indicated that the purchaser was to be "XYZ Corporation, a special purpose entity" until the actual purchaser was identified or formed. On June 21, 1999, Shap II was incorporated in the State of Delaware to purchase the Double-D Ranch stock.

The Double-D Ranch assets were valued as follows:

| Description | Amount |
| --- | --- |
| Cash | $21,125,554 |
| AHP stock | 129,085,440 |
| Other securities | 162,335,803 |
| Land--farm | 6,340,000 |

Double-D Ranch's marketable securities were held in two accounts with Bessemer Trust; the remaining marketable securities were held in an account with the Bank of New York.

The agreed-upon discount applied to the fair market value of Double-D Ranch's assets was 4.25 percent of the fair market value of Double-D Ranch's assets minus Double-D Ranch's tax bases in those assets.

Shap II's Financing and the Future Asset Sale

Shap II financed its purchase of the Double-D Ranch stock with a loan from Utrecht-America Finance Co. (Utrecht), a wholly owned subsidiary of Rabobank Nederland (Rabobank). Utrecht issued a commitment letter to Shap II indicating its agreement to lend up to $325 million to Shap II for the acquisition of the Double-D Ranch stock.

Rabobank imposed certain conditions on Shap II as part of its agreement to lend the $325 million. The biggest condition was that Shap II enter into a binding agreement to sell the Double-D Ranch assets after Shap II purchased the corporate

stock.  To that end, Shap II entered into a letter agreement with Morgan Stanley.

Shap II and Morgan Stanley executed a document titled "Execution by Morgan Stanley of Volume-Weight Average Price and Market-on-Close Trades on Risk Basis" (the Shap II-Morgan Stanley agreement or the agreement).  Pursuant to the agreement, Shap II agreed to sell the AHP stock and other securities held by Double-D Ranch to Morgan Stanley on the "closing date".  The Shap II-Morgan Stanley agreement initially listed the closing date as July 1, 1999, but it was later changed to July 6, 1999.

The securities to be sold pursuant to the Shap II-Morgan Stanley agreement were to be valued according to the same method used by Shap II to value the Double-D Ranch assets.

Execution of the Stock Sale

On June 25, 1999, Shap II and the Double-D Ranch shareholders executed a stock purchase agreement.  Petitioner, Mr. Power (representative for Bessemer Trust), and Mr. Bisset signed on behalf of the marital trust.  Mr. Bisset signed on behalf of The Diebold Foundation, and Mr. Rhodes signed on behalf of Shap II.  The stock purchase agreement indicated that the closing for the sale would occur on July 1, 1999.

The parties established additional bank accounts to handle the various funds transfers made pursuant to the stock purchase

agreement.  On July 1, 1999, the Double-D Ranch stockholders entered into a "Contribution Escrow Agreement" (the escrow agreement) with Bessemer Trust.  Pursuant to the escrow agreement, Bessemer served as the stockholders' representatives for all matters relating to the stock purchase agreement. Further, the escrow agreement established an escrow account with Bessemer Trust.  Bessemer Trust agreed to act as escrow agent with respect to the escrow account.

Both the Double-D Ranch stockholders and Shap II agreed to deposit a portion of their funds into the escrow account for the purpose of satisfying any outstanding business obligations of the marital trust and the Diebold Foundation that may have preexisted the sale.  The Double-D Ranch stockholders would deposit a portion of their proceeds from the sale of their stock, which would be used in a like manner.  Shap II agreed to hold back $10 million from the purchase price and to deposit that held-back amount into the escrow account.  The held-back amount would then be released from the escrow account and paid to the Double-D Ranch stockholders on July 9, 1999, subject to certain adjustments relating to certain liabilities of the Double-D Ranch which might have arisen.

The closing was delayed from July 1 to July 2, 1999, and the stock purchase agreement was amended to reflect the changed date.

Before the closing, Mr. Bisset informed the Bank of New York that he would provide written confirmation of the stock sale and that after receiving that confirmation, the Bank of New York should transfer the Double-D Ranch assets held there to various accounts of Shap II.

On July 2, 1999, in connection with the closing, Bessemer Trust, Double-D Ranch, and Shap II executed a letter agreement that irrevocably instructed Bessemer Trust to transfer custody of Double-D Ranch's marketable securities to Morgan Stanley on July 6, 1999. Also on that date, Mr. Rhodes, as president of Shap II, instructed Morgan Stanley to transfer $258,546,764 to Shap II's Rabobank account.

Pursuant to the amended stock purchase agreement, Shap II agreed to pay $307 million for the Double-D Ranch stock. Of that $307 million, $297 million would be paid immediately, with $10 million deposited into the escrow account to satisfy Shap II's obligation to provide the held-back amount.

The various closing documents relating to the sale by Double-D Ranch's shareholders of its common stock to Shap II were executed on July 2, 1999, and Shap II became the owner of all of the outstanding shares of Double-D Ranch stock. On July 2, 1999, Rabobank deposited $295,975,000 into Shap II's Rabobank account, $297 million was transferred to the escrow account, and $975,000

was transferred back to Rabobank as its fee for assisting in the transaction.

On July 9 and July 12, 1999, Shap II paid the Double-D Ranch shareholders the held-back amount and additional amounts to reflect certain price adjustments.

Ultimately, the Double-D Ranch shareholders received the following consideration for the corporation stock:[3]

| Description | Date | Amount |
| --- | --- | --- |
| Payment at closing | 7/2/99 | $297,000,000 |
| Held back and adjustment | 7/9/99 | 11,556,321 |
| Price adjustment | 7/12/99 | 608,800 |
| Price adjustment | 7/12/99 | 34,066 |

The following amounts were distributed from the escrow account to the marital trust:

| Date | Amount |
| --- | --- |
| 7/6/1999 | $183,879,480 |
| 7/12/1999 | 8,276,028 |
| 11/8/1999 | 10,541,167 |
| 3/26/2004 | 3,754,850 |
| 4/15/2004 | 6,989 |

The following amounts were distributed from the escrow account to The Diebold Foundation:

| Date | Amount |
| --- | --- |
| 7/6/1999 | $92,120,520 |
| 7/12/1999 | 4,156,098 |
| 11/8/1999 | 5,280,900 |

---

[3]All amounts are rounded to the nearest dollar.

The transfers from the escrow account to the marital trust and The Diebold Foundation were made by Bessemer Trust pursuant to the escrow agreement. The 2004 distributions to the marital trust corrected a misallocation made at the time of the stock sale.

Real Estate Dealings

Double-D Ranch owned more than 500 acres in Connecticut. As of July 2, 1999, the farm had a fair market value of $6,340,000. The value was determined by an appraisal requested by Mr. Power.

Mr. D. Diebold formed Toplands Farm, LLC (Toplands Farm), to purchase and operate the farm. On July 2, 1999, Toplands Farm paid $1,000 for an option to purchase the farm at its fair market value, $6,340,000. On July 28, 1999, Toplands Farm paid Shap II $317,000 as a downpayment for the farm. On August 27, 1999, Toplands Farm made a final payment of $6,022,000 for the farm. The $1,000 option, the $317,000 downpayment, and the $6,022,000 final payment added up to the $6,340,000 Toplands Farm paid for the farm, in accord with its fair market value per the appraisal.

After-Closing Asset Transfers

On July 2, 1999, after the stock sale had been completed, Mr. Rhodes, acting as Double-D Ranch president, directed Bessemer Trust to transfer the marketable securities owned by Double-D Ranch to Morgan Stanley on July 6, 1999. Double-D Ranch and

Morgan Stanley also executed a pledge and security agreement which granted Morgan Stanley a security interest in the securities held by Bessemer Trust. Morgan Stanley agreed not to take possession of the securities before July 6, 1999.

On that date Bessemer Trust transferred the Double-D Ranch assets from its own accounts to Shap II's Morgan Stanley accounts. The Bank of New York also transferred its Double-D Ranch asset holdings to Shap II's accounts at Morgan Stanley.

The proceeds of the securities sold to Morgan Stanley were initially placed on Shap II's Morgan Stanley account. Shortly thereafter they were transferred to Shap II's Rabobank account and used in part to repay Rabobank's loan to Shap II.

Shap II received the following from its sale of the Double-D Ranch's assets:

| Description | Amount |
| --- | --- |
| Securities | $291,230,614 |
| Land | 6,340,000 |
| Cash | 21,126,554 |
| Total | 318,697,168 |

Dissolution of the Diebold Foundation

The Diebold Foundation adopted a "Plan of Dissolution and Distribution of Assets", effective January 29, 2001. The plan was approved by the Supreme Court of the State of New York.

The assets of The Diebold Foundation were divided and distributed in equal shares to three new charitable foundations: (1) The Salus Mundi Foundation; (2) the Diebold Foundation, Inc. (the Diebold Foundation--Connecticut); and (3) the Ceres Foundation, Inc. (the Ceres Foundation). All three foundations are section 501(c)(3) charitable foundations, and each received $32,918,670 from the Diebold Foundation.

Return Filings

### Petitioner

The marital trust and petitioner reported the stock sale according to its form for Federal income tax purposes. Petitioner timely filed a Form 1040, U.S. Individual Income Tax Return, for 1999, reporting capital gain of $100,376,799 on the sale of the Double-D Ranch stock. Petitioner timely paid an income tax liability of $18,399,332 for 1999, including tax on the above-referenced capital gain.

### Double-D Ranch and Shap II

Double-D Ranch filed a Form 1120, U.S. Corporation Income Tax Return, for its July 2, 1999, tax year. The parties have stipulated that this return was timely if the form of the transaction as a stock sale is upheld.

Shap II filed a Form 1120 on December 20, 2000, on behalf of a consolidated group of which Shap II and the former Double-D

Ranch were the only members. The Form 1120 reported as part of its consolidated income the built-in gain from the sale of the Double-D Ranch assets on July 6, 1999. The consolidated return also reported artificial losses that offset those gains. Ultimately, the Form 1120 did not show a tax liability resulting from the sale of the Double-D Ranch's assets. On March 10, 2006, respondent issued a notice of deficiency to Double-D Ranch for its tax year ending July 2, 1999. The notice determined that Double-D Ranch was liable for a tax deficiency of $81,120,064 on gain from the sale of its assets, plus an accuracy-related penalty. Double-D Ranch did not petition this Court in response to the notice.

The deficiency determined was based upon respondent's recharacterization of the transaction as a sale of the Double-D Ranch assets followed by a liquidating distribution to the corporation's shareholders. Further, the notice was issued more than 3 years after Double-D Ranch filed its return. Respondent contends that the 6-year period of limitations under section 6501(e) applies. This argument is also based on respondent's characterizing the transaction as an asset sale followed by dissolution, rather than as a stock sale.

On July 31, 2006, respondent assessed the following amounts against Double-D Ranch:

| Description | Amount |
| --- | --- |
| Tax | $81,120,064 |
| Sec. 6662 penalty | 16,224,013 |
| Interest | 3,171,631 |

On August 2, 2007, respondent issued a notice of transferee liability to petitioner.  The notice asserted transferee liability against petitioner of $97,344,077, plus interest, determining that petitioner was liable as a transferee of the Double-D Ranch.  On July 11, 2008, respondent issued notices of liability to the Salus Mundi Foundation, the Ceres Foundation, and the Diebold Foundation--Connecticut.  The notices of liability issued to the three foundations are attempts by respondent to collect from them as transferees of The Diebold Foundation.

Petitioner filed a petition on October 26, 2007, in response to the notice of liability.  A trial was held in Washington, D.C.

OPINION

Section 6901(a)(1) is a procedural statute authorizing the assessment of transferee liability in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the transferee liability was incurred.  Section 6901(a) does not create or define a substantive liability but merely provides the Commissioner a remedy for enforcing and collecting from the transferee of the

property the transferor's existing liability.  Coca-Cola Bottling Co. v. Commissioner, 334 F.2d 875, 877 (9th Cir. 1964), affg. 37 T.C. 1006 (1962); Mysse v. Commissioner, 57 T.C. 680, 700-701 (1972).  Section 6902 provides that the Commissioner has the burden of proving the taxpayer's liability as a transferee but not of showing that the transferor was liable for the tax.

Under section 6901(a) the Commissioner may establish transferee liability if a basis exists under applicable State law or State equity principles for holding the transferee liable for the transferor's debts.  Commissioner v. Stern, 357 U.S. 39, 42-47 (1958); Bresson v. Commissioner, 111 T.C. 172, 179-180 (1998), affd. 213 F.3d 1173 (9th Cir. 2000).

We must determine whether respondent has shown that petitioner was liable as a transferee.

I.   Notice of Transferee Liability

On August 2, 2007, respondent issued a notice of liability to petitioner asserting transferee liability of $97,344,077, plus interest, for the tax liability of Double-D Ranch.  We note that the proceeds of the stock sale went to the marital trust and the Diebold Foundation, not to petitioner.

Under New York State law, properly created trusts are independent legal entities with separate juridical status.  See Pinckney v. City Bank Farmers Trust Co., 292 N.Y.S. 835, 838

(App. Div. 1937) (trust created under New York law is a legal entity and continues as such to the end fixed by its own terms). Thus, the separate legal existence of a marital trust must be respected for purposes of determining any transferee liability unless it can be shown that the marital trust should be disregarded under New York law.

The New York Court of Appeals has held that courts may disregard the form of a trust when the trust was formed for an illegal purpose or if there is not the requisite separation between beneficiary and trustee.  <u>Natl. Union Fire Ins. Co. of Pittsburgh, Pa. v. Eagle Equip. Trust</u>, 633 N.Y.S.2d 308, 309 (App. Div. 1995).

A.   <u>Respondent's Position</u>

Respondent argues that the marital trust acted as a mere conduit for the transfer of the proceeds from the sale of the assets of Double-D Ranch to petitioner.  To support this argument, respondent points to the 1999 fiduciary tax returns filed by the marital trust reporting that petitioner was the "grantor/owner" of the marital trust.  Respondent then concludes that petitioner should be treated as the owner of the marital trust assets for Federal tax purposes and that therefore petitioner should also be treated as the owner of the marital trust assets for transferee liability purposes.

Respondent also argues that regardless of the marital trust's status under New York law, the marital trust constituted a mere conduit for the transfers between Double-D Ranch and petitioner. More specifically, respondent contends that petitioner acted as the beneficial owner of the marital trust, dealing with the marital trust assets as if she owned and controlled them. Additionally, respondent argues that Double-D Ranch sold all of its assets and then distributed all of the proceeds to petitioner through the marital trust and the Diebold Foundation in de facto liquidation, without retaining any funds to pay the corporate-level tax generated by the sale of its assets.

B. Petitioner's Position

Petitioner contends that the marital trust was a separate entity and must be respected for Federal income tax purposes. Petitioner claims that although the marital trust identified itself as a "grantor trust" on its income tax returns, the marital trust did not constitute a grantor trust in 1999 or at any time after Mr. Diebold's death on June 18, 1996.

II. Discussion

Respondent asserts that regardless of the marital trust's status under New York State law, the marital trust constituted a mere conduit for the transfers between Double-D Ranch and

petitioner. Respondent believes that the marital trust should be disregarded. We disagree.

We can find no caselaw in New York or elsewhere to the effect that a trust's being a grantor trust plays a role in determining the transferee liability of the grantor. As stated above, we look to New York State law to determine transferee liability. However, even if a trust's status as a grantor trust were relevant to transferee liability of the grantor, we do not find that the marital trust was a grantor trust.

A grantor trust is created when a person contributes cash or property to a trust but continues to be treated as owner of the cash or property, at least in part. See secs. 671-679. A reading of the marital trust agreement makes it clear that this was not a grantor trust.[4] Mr. Diebold, not petitioner, was

---

[4]The trust agreement which created the marital trust read in part:

> The Trustees shall pay or apply to the Settlor's said wife all or such sums of principal of this trust as the Trustees (other than Settlor's said wife should she then be acting as a Co-trustee of such trust) in their absolute discretion may deem necessary or advisable from time to time for her proper medical. care, support and comfortable maintenance, or for any other purpose or purposes, without limitation, of the Settlor's said wife deemed prudent and advisable to the trustees, giving primary consideration to her needs or desires, without regard to any other income or property available to her for such purposes from any other sources, it being intended that this power shall be liberally construed in favor of the Settlor's said wife so that she shall have sufficient income and principal available from

(continued...)

responsible for creating the marital trust, and during his life he retained the right to withdraw and take possession of any property held by the marital trust or to revoke the marital trust agreement entirely. Petitioner held no such powers.

Thus, since petitioner did not create the marital trust, she can be treated as its owner under the grantor trust rules only if she had a power exercisable solely by herself to vest the corpus or the income of any portion of the trust in herself or to apply the corpus or income for the satisfaction of her legal obligations. See secs. 1.678(a)-1 and 1.678(b)-1, Income Tax Regs. Petitioner did not have any such right under the marital trust agreement and therefore should not be treated as owner of the marital trust for Federal income tax purposes. Petitioner had only the rights or fiduciary duties relating to the marital trust that were granted to her by Mr. Diebold through the terms of the marital trust agreement. Petitioner's rights and powers under the marital trust agreement were limited and did not vest in her ownership or control of the assets of the marital trust. The marital trust agreement required the trustees to exercise their discretion over any distribution of the marital trust income or principal to petitioner, to provide for her medical

---

[4](...continued)
all sources to enable her to maintain the standard of living to which she was accustomed during the Settlor's lifetime.

care, support, and maintenance, and to ensure that she had sufficient resources to maintain the standard of living to which she was accustomed.[5]

Next, respondent asserts that petitioner was the beneficial owner of the assets of the marital trust, exercising dominion and control over those assets, and that any discretionary approval by her cotrustees was a mere formality. As evidence for this beneficial ownership, respondent points to several requests that petitioner made through the trustees for various sums to be distributed to either herself or the Diebold Foundation. Respondent claims that when petitioner approached the trustees, she used the word "directed" rather than "requested", which indicated that petitioner controlled the assets of the marital trust. The use of "directed" rather than "requested" does not change the terms of the marital trust agreement. Every step that petitioner took in requesting transfers was taken through the trustees as the marital trust agreement required. The trustees were notified in writing of petitioner's requests and agreed to have the requested funds placed into her account or into that of

_____

[5]Respondent also argues that the duty of consistency should be applied and thus the marital trust should be deemed a grantor trust since it was identified as such for the years 1999-2004. Respondent incorrectly applies the duty of consistency. Under the duty of consistency, petitioner is bound by the facts asserted in her returns for Federal income tax purposes. See Blonien v. Commissioner, 118 T.C. 541 (2002). Respondent did not present any tax benefit that petitioner received from the marital trust characterization.

the Diebold Foundation.  Respondent believes that petitioner had control over all the assets of the marital trust, but we have not seen any evidence of such power.  The marital trust was established by Mr. Diebold for petitioner's care and support, but she was not given ownership of the assets.  None of petitioner's requests were unreasonable or contrary to the marital trust agreement.  Under New York State law, the trustees were at all relevant times required to act reasonably and in good faith in complying with the terms of the marital trust agreement.  Estate of Stillman, 433 N.Y.S.2d 701, 707-708 (Sur. Ct. 1980) (court will interfere with exercise of discretion by trustee who acts in bad faith or "beyond the bounds of a reasonable judgment").

Additionally, respondent claims that the marital trust should be disregarded because petitioner participated in a fraudulent transfer of the assets of Double-D Ranch.  Respondent asserts that there was a de facto liquidation plan in place from the start of the transactions and that without a liquidation, petitioner would not have been able to give her children any distributions.

As of June 30, 1999, the marital trust owned assets worth $138 million, in addition to the shares of Double-D Ranch common stock.  Presuming the sale of the stock is treated as a plan of liquidation, respondent has failed to prove that petitioner

participated in a fraudulent conveyance as a result of a plan of liquidation of Double-D Ranch.

Respondent has not directly raised the issue of whether petitioner is a transferee of a transferee with the marital trust being the initial transferee. Because we reject the position that the marital trust may be disregarded, respondent must prove that petitioner is liable as a transferee from the marital trust. However, we first note that respondent has not raised this argument in the pleadings or the notice of liability which asserted transferee liability against petitioner. Because respondent's argument on brief might be construed to raise the issue, we will address it.

It is well settled that transferee liability may be asserted against a transferee of a transferee. Berliant v. Commissioner, 729 F.2d 496 (7th Cir. 1984), affg. Magill v. Commissioner, T.C. Memo. 1982-148. The Commissioner may collect unpaid income taxes of a transferor of assets from a transferee or a successor transferee of those assets. Sec. 6901(a), (c)(2); Commissioner v. Stern, 357 U.S. at 42; Stansbury v. Commissioner, 104 T.C. 486, 489 (1995). State law generally determines the extent of the transferee's liability. Commissioner v. Stern, supra at 45; Gumm v. Commissioner, 93 T.C. 475, 479 (1989), affd. without published opinion 933 F.2d 1014 (9th Cir. 1991). Therefore, we apply New York law in deciding whether petitioner is liable as a

transferee under section 6901.[6]  The Commissioner bears the burden of proving that the taxpayer is liable as a transferee under State law or in equity.  Sec. 6902(a); Rule 142(d); Gumm v. Commissioner, supra at 479-480.

For respondent to establish that petitioner is liable as a transferee from the marital trust requires more than simply the assertion that distributions were made from the marital trust. Respondent must prove that the distributions caused the marital trust to be insolvent at the time they were made and that the distributions from the marital trust should be treated as fraudulent conveyances under New York law.  There is no such evidence in the record.  Respondent has simply failed to carry the burden of proving that petitioner is liable as a transferee from the marital trust, and we will not assume such liability on the basis of conjecture.

---

[6]The New York Uniform Fraudulent Conveyance Act includes provisions imposing transferee liability on grounds of both actual and constructive fraud.  See N.Y. Debt. & Cred. Law secs. 273, 276 (McKinney 2001).  With regard to constructive fraud, New York law provides that "Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to is his actual intent if the conveyance is made or the obligation incurred without a fair consideration."  N.Y. Debt. & Cred. Law sec. 273.  N.Y. Debt. & Cred. Law sec. 273 been interpreted as requiring the satisfaction of three elements to establish transferee liability:  (1) A conveyance; (2) made without fair consideration; and (3) by a person who was or will be rendered insolvent by the conveyance.  See United States v. McCombs, 30 F.3d 310, 323 (2d Cir. 1994).

## III.  <u>Conclusion</u>

In summary, we find that the marital trust should not be disregarded and that respondent has not met the burden of showing petitioner is liable as a transferee from the marital trust.  As a result, we hold that petitioner is not liable as a transferee.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>for petitioner</u>.