**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| SALUS MUNDI FOUNDATION, Transferee, | No. 12-72527 |
| *Petitioner-Appellee*, | Tax Ct. No. 24741-08 |
| v. | |
| COMMISSIONER OF INTERNAL REVENUE, | OPINION |
| *Respondent-Appellant*. | |

Appeal from a Decision of the
United States Tax Court

Argued and Submitted
November 21, 2014—San Francisco, California

Filed December 22, 2014

Before: John T. Noonan and Sandra S. Ikuta, Circuit
Judges, and William H. Albritton, Senior District Judge.[*]

Opinion by Judge Noonan

[*] The Honorable William H. Albritton III, Senior District Judge for the U.S. District Court for the Middle District of Alabama, sitting by designation.

## SUMMARY[**]

### Tax

The panel reversed the United States Tax Court's decision that the Salus Mundi Foundation was not liable under 26 U.S.C. § 6901 for unpaid tax liability arising from the sale of appreciated assets held by Double-D Ranch, Inc., and remanded.

The panel concluded that the two requirements of section 6901, transferee status under federal law and substantive liability under state law, are separate inquiries. Adopting the reasoning of *Diebold Foundation, Inc. v. Comm'r*, 736 F.3d 172 (2d Cir. 2013), the panel held that the state law substantive liability requirement was satisfied because the Double-D shareholders made a fraudulent conveyance under the New York Uniform Fraudulent Conveyance Act. The panel remanded to the Tax Court to determine:  (1) Salus Mundi's status as a transferee of a transferee under the federal law inquiry of section 6901; and (2) whether the IRS assessed liability within the applicable limitations period.

### COUNSEL

Arthur T. Catterall (argued), Kenneth L. Greene, and Gilbert S. Rothenberg, Attorneys, Tax Division, Department of Justice, Washington, D.C., for Respondent-Appellant.

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

A. Duane Webber (argued), Phillip J. Taylor, Summer M. Austin, and Mireille R. Zuckerman, Baker & McKenzie, LLP, Washington, D.C.; Jaclyn Pampel, Baker & McKenzie, Chicago, Illinois, for Petitioner-Appellee.

## OPINION

NOONAN, Circuit Judge:

### OVERVIEW

The IRS appeals the United States Tax Court's decision that the Salus Mundi Foundation was not liable under 26 U.S.C. § 6901 for the unpaid tax liability arising from the sale of appreciated assets held by Double-D Ranch, Inc.

We conclude that the two requirements of 26 U.S.C. § 6901 — transferee status under federal law and substantive liability under state law — are separate and independent inquiries. Therefore, the IRS cannot rely on federal law to recharacterize the series of transactions for purposes of the state law inquiry.

The Second Circuit addressed the same factual and legal issues in *Diebold Foundation, Inc. v. Comm'r*, 736 F.3d 172 (2d Cir. 2013). We adopt the reasoning of that opinion on the state law inquiry and conclude that the Double-D shareholders had constructive knowledge of the fraudulent tax avoidance scheme at issue. Accordingly, we collapse the series of transactions and conclude that the shareholders made a fraudulent conveyance under the New York Uniform Fraudulent Conveyance Act and that the state law liability prong of 26 U.S.C. § 6901 was therefore satisfied.

We remand to the Tax Court to determine in the first instance: (1) Salus Mundi's status as a transferee of a transferee under the federal law inquiry of 26 U.S.C. § 6901; and (2) whether the IRS assessed liability within the applicable limitations period.

## FACTUAL AND PROCEDURAL HISTORY

### A.  Background on the Diebold Family and Double-D Ranch, Inc.

Richard Diebold was a major shareholder of American Home Products Corporation (AHP), a publicly traded corporation.  In 1980, he formed Double-D Ranch, Inc. as a personal holding company for investment assets, including shares of AHP, other marketable securities, and real estate. Richard Diebold was married to Dorothy Diebold, and they had three children.

When Richard Diebold died in 1996, ownership of all the stock of Double-D was transferred to the Dorothy R. Diebold Marital Trust.  The marital trust had three cotrustees: Dorothy Diebold; the Bessemer Trust Co.; and Andrew Bisset, Dorothy Diebold's personal attorney.  Austin Power, Jr. was a senior vice president at Bessemer Trust who served as counsel and primary account manager for the marital trust.

In 1999 Dorothy Diebold was 94 years old and "anxious" to make cash gifts to her children.  Power explained to her that the marital trust was insufficiently liquid to make such gifts, but she would be able to make cash gifts if she were to sell the shares of Double-D.  After this explanation, "she was anxious for [Bessemer] to proceed with the sale of the Double D Ranch," and the other trustees agreed.

As part of the decision to sell Double-D, the marital trust transferred one-third of the Double-D shares to the Diebold Foundation, a charitable foundation incorporated by Richard Diebold in 1963 in New York.  In 1999 its directors were Dorothy Diebold, Bisset, and Dorothy Diebold's three adult children.  Each of the three adult children intended to organize their own foundations, one of which became the Salus Mundi Foundation. The directors of the Diebold Foundation planned to sell the shares of Double-D and distribute the money to the children's foundations.

Power was given primary responsibility by the Double-D shareholders to sell the shares of Double-D.

**B. Double-D's Built-In Gain Tax Liability and the Use of Intermediary Transactions**

In 1999, Double-D's assets were valued at approximately $319 million, including approximately $129 million of AHP stock, $162 million of other marketable securities, and $6 million of real estate in a Connecticut farm; the adjusted tax bases of these assets were nominal or low.  If Double-D simply sold its assets, it would be taxed on the built-in gain of those assets, i.e. the difference between the selling price of the assets and their adjusted tax bases.  *See* 26 U.S.C. §§ 1(h), 1001, 1221, 1222.  Sale of Double-D's assets would have triggered tax liability of approximately $81 million.

Another option was to sell shares of  Double-D.  In that case, Double-D would continue to own the appreciated assets, and the built-in gain tax would not be triggered.  *See Diebold Found., Inc. v. Comm'r*, 736 F.3d 172, 175–76 (2d Cir. 2013) (discussing generally the issue of appreciated assets and the use of intermediary transactions to avoid tax liability).  But

with a stock sale, the assets would retain their low tax bases, and the built-in gain tax liability would be triggered if Double-D's new owners ever sold the assets. *Id.* For this reason, a potential buyer of Double-D's shares would demand a substantially lower price to account for the built-in gain tax liability. *Id.*

An intermediary transaction tax shelter, also known as a Midco transaction, is a financial arrangement designed to allow a seller to have the benefits of a stock sale and the buyer to have the benefits of an asset purchase with both seller and buyer avoiding the built-in gain tax liability. *Id.* The shareholders sell their shares in a corporation to an intermediary entity at a purchase price that does not discount for the built-in gain tax liability; the intermediary then sells the assets of the corporation to the buyer, who gets a purchase price basis in the assets. *Id.* The intermediary keeps the difference between the asset sale price and the stock purchase price as its fee. *Id.*

The intermediary attempts to avoid the built-in gain tax liability by claiming tax attributes, such as losses, that if legitimate would allow the intermediary to absorb the liability. *Id.*; *see also* I.R.S. Notice 2001–16, 2001–1 C.B. 730; I.R.S. Notice 2008-111, 2008-51 I.R.B. 1299. If the intermediary's tax attributes turn out to be artificial, then the built-in gain tax liability of the sold assets remains outstanding. *Diebold*, 736 F.3d at 176. The IRS may seek to collect from the intermediary, but the intermediary is often a newly formed entity without other assets and is thus likely to be judgement-proof. *Id.* The IRS may then seek payment from the other parties to the transaction. *Id.*

## C.  Double-D's Meetings with Potential Purchasers

Power recognized Double-D's built-in gain tax liability as a "problem" and reached out to "a whole network of people, for months" to try to find a solution that maximized the purchase price for Double-D.  Power consulted Richard Leder, Bessemer's "principal outside tax counsel."  Leder testified that "it was generally known to – in that profession that there were . . . some people, who for whatever reason, whatever their tax activities are, were able to make very favorable offers to sellers with stock with appreciated assets . . . with the corporation having appreciated assets."  Leder directed Power to one of these "people," Harry Zelnick of River Run Financial Advisors, LLC, as a potential purchaser for Double-D.  Another managing director at Bessemer referred Power to Fortrend International LLC.

On May 26, 1999, Power, Leder, and other representatives of the Double-D shareholders met and discussed the potential sale of Double-D with Zelnick and Ari Bergman, a principal at Sentinel Advisors LLC, "a small investment banking firm that specialized in structuring economic transactions to solve specific corporate and estate or accounting issues."  On May 28, Bessemer received the written summaries of the strategies discussed, including an Executive Summary that discussed "efficiently liquidating the portfolio" and indicated that "Sentinel Advisors has performed comprehensive portfolio and liquidity analysis on your holdings and would like to present several different benchmark alternatives for evaluating the liquidation of a large equity portfolio."

On June 1, Power and other Double-D representatives met with Fortrend.  Fortrend representatives presented a strategy

entitled "Buy Stock/Sell Assets Transaction," described as "working with various clients who may be willing to buy the stock from the seller and then cause the target corporation to sell its net assets to the ultimate buyer. These clients have certain tax attributes that enable them to absorb the tax gain inherent in the assets."

### D.  Stock Purchase Agreement between Double-D and Sentinel

The Double-D representatives decided to sell to Sentinel. Sentinel agreed to a cash purchase of all shares of Double-D at a price equal to the fair market value of Double-D's assets minus a discount of 4.25% of the built-in gain. Power sent Dorothy Diebold a letter seeking her approval in which he stated that the arrangement "works out to 97% of the market value" of Double-D's assets. If Double-D had sold its assets directly, the built-in gain tax liability would have resulted in the shareholders realizing only about 74.5% of the market value.

In the initial term sheet that Sentinel sent to Bessemer, the Purchaser of Double-D was listed as "XYZ Corporation, a special purpose entity." This placeholder eventually became Shap Acquisition Corporation II (Shap), a new entity which Sentinel created specifically  to facilitate the liquidation of Double-D's assets.

Rabobank, a bank based in the Netherlands, provided a 30-day loan to Shap on the condition that Shap enter into a fixed price contract to sell the marketable securities, with the purchase price to be paid directly to Rabobank pursuant to an irrevocable payment instruction. Rabobank anticipated the loan to Shap "to be outstanding for not more than 5 business

days" because five days was the "longest settlement period for these securities that will be liquidated." Shap entered into a fixed price contract to sell the securities to Morgan Stanley.

On June 24, a draft stock purchase agreement was sent to Power and other Double-D representatives. The draft contained several references to Shap's arrangements with Morgan Stanley, including a section entitled "Parties in Interest" which provided that "Purchaser [Shap] may assign its rights and interests under this Agreement to Morgan Stanley as collateral security for [Shap's] obligation to deliver the Securities to Morgan Stanley following the Closing for purposes of resale. . . ." "Securities" was defined to mean the securities owned by Double-D as of the closing date.

One of the lawyers for the Double-D shareholders deleted all references to Morgan Stanley in the draft stock purchase agreement. The lawyers also added language specifically disclaiming the shareholders' responsibility for any tax liabilities arising from the sale of Double-D's assets: "Purchasers [Shap], not Sellers [Double-D's shareholders], shall be responsible for all Taxes . . . regardless of taxable period, arising from any sale or disposition of any of the Securities or the Farm." Another added provision provided that "any sale or other disposition by [Double-D] that is consummated after the acquisition of the Shares by [Shap] shall be treated as occurring after the period ending on the Closing Date."

Following these negotiations, the Double-D shareholders and Shap executed the stock purchase agreement on June 25, 1999, with a closing date of July 1, 1999. Also on June 25, Shap and Morgan Stanley entered into a contract for Shap to

sell the securities held by Double-D to Morgan Stanley on July 1, 1999. The agreement between Shap and Morgan Stanley referenced the agreement between Shap and the Double-D shareholders and mandated the use of the same valuation method for the securities.

The stock purchase agreement also required Shap to cause Double-D to execute an option agreement on the Connecticut farm "immediately" after the closing, giving Toplands Farm, a LLC created by Dudley Diebold, one of the adult Diebold children, the option to purchase the farm for $6.3 million. The option agreement was signed by Dudley Diebold on June 30, 1999. On June 30, Dudley Diebold also executed an occupancy agreement that set forth the terms for Toplands to take possession of the property on July 1, 1999.

### E. Closing of the Stock Purchase Agreement and Sale of Double-D's Assets

The closing of the stock sale between the Double-D shareholders and Shap was delayed from July 1 to July 2, 1999. Power testified that the delay was due to Morgan Stanley "[seeking] custody and/or control over some of the Double-D Ranch assets prior to the closing." Power further testified that "[t]here was no way we [the Double-D shareholders] were going to part with any of the Double-D Ranch assets prior to the closing, prior to basically delivering the shares against the cash purchase price."

Because of the delay, Shap was unable to deliver the securities held by Double-D to Morgan Stanley on July 1 as mandated by their agreement. The terms of that agreement provided that Shap "irrevocably agree[s] that, in the event that the Stock Purchase Agreement Closing does not occur on

the Stock Purchase Agreement Closing Date, [Shap] remain[s] obligated to deliver to Morgan Stanley (I) shares fungible with, in all respects, the Shares; or (ii) the amount of cash equivalent . . . ." But Morgan Stanley did not require Shap to comply with this provision; instead "Morgan Stanley backed down" after Bessemer intervened. Power testified that:

> I spoke with Tim Morris who was the head of the Bessemer investment department, and I said, somehow or other Morgan Stanley is trying to throw a monkey wrench into our Double-D Ranch closing. And it's my understanding that Mr. Morris made a call to one of the persons, the senior people he knew at Morgan Stanley, and at some point shortly after that, they backed off and we closed as we were planning to do, but a day delayed.

After Bessemer's intervention, the two agreements were amended: the closing date of the stock purchase agreement between the Double-D shareholders and Shap was changed to July 2, and the settlement date of the agreement between Shap and Morgan Stanley to deliver Double-D's securities was changed to July 6.

The planned transactions then went forward. On July 2, the Double-D shareholders sold their shares to Shap. Immediately after the closing on July 2, the new president of Double-D countersigned the option and occupancy agreements with Toplands Farm. On July 6, Double-D's securities were transferred to Morgan Stanley. Morgan Stanley recorded a trade date of July 2 and a settlement date of July 6 (or July 8 for one security). Later in July and

August, Toplands Farm exercised its option and paid Shap
$6.3 million for the Connecticut farm.

Shap ultimately paid the Double-D shareholders
approximately $309 million and received about $319 million
from its sale of Double-D's assets. Because Shap claimed
losses sufficient to off-set the built-gain tax liability, it did not
pay any tax on its sale of Double-D's assets. After repayment
of its Rabobank loan, Shap retained profits of about $10
million.

The $309 million paid to the Double-D shareholders was
distributed proportionally to the marital trust and the Diebold
Foundation. Pursuant to a plan of dissolution effective
January 29, 2001, the Diebold Foundation distributed all of
its assets in equal shares to the three foundations formed by
the Diebold children: the Salus Mundi Foundation, the Ceres
Foundation, and the Diebold Foundation. These transfers, of
approximately $33 million each, were not made in exchange
for any property or in satisfaction of any existing debt.

## F.  Tax Filings and IRS Collection Efforts

All of the parties to this intermediary transaction filed tax
returns. The Double-D shareholders filed returns that
reflected the sale of their shares to Shap on July 2, 1999. On
March 20, 2000, Double-D filed a corporate return for a short
taxable year of July 1–2, 1999, and indicated that it was filing
its final return. This return did not report the sale of
securities to Morgan Stanley or the sale of the Connecticut
farm to Toplands Farm. Shap filed a consolidated return with
Shap Holdings, Inc. (the new name for Double-D) for the
taxable year ending June 30, 2000. On this return, Shap
reported the sale of Double-D's assets and the resulting built-

in gain, but Shap also claimed losses sufficient to offset the gain and reported no net tax liability. The Tax Court later determined that these losses were artificial losses resulting from a tax shelter known as a Son-of-BOSS transaction. *See Desmet v. Comm'r*, 581 F.3d 297, 299–300 (6th Cir. 2009) ("A typical Son-of-BOSS scheme uses a series of contrived steps in a partnership interest to generate artificial tax losses designed to offset income from other transactions." (internal quotation marks omitted)).

On March 10, 2006, the IRS issued a notice of income tax liability against Double-D for the July 1–2, 1999 taxable year, assessing a deficiency of approximately $81 million plus penalties and interest. The IRS determined that the sale of Double-D stock on July 2 by the Double-D shareholders was, in substance, actually a sale of Double-D's assets followed by a liquidating distribution to the shareholders. Double-D did not contest this assessment, but the IRS was unable to find any assets of Double-D from which to collect the liability.

Deciding that further efforts to collect from Double-D would be futile, the IRS attempted to collect from the Double-D shareholders as transferees of Double-D pursuant to 26 U.S.C. § 6901.

## G. Tax Court Proceedings

On August 7, 2007, the IRS issued a notice of transferee liability against Dorothy Diebold as a transferee of Double-D. Dorothy Diebold contested the assessment. After a trial, the Tax Court determined that she was not liable because the marital trust was the actual Double-D shareholder, and the Tax Court chose not to disregard its separate existence. *Diebold v. Commissioner*, 100 T.C.M. (CCH) 370 (T.C.

2010), 2010 WL 4340535, at \*8–10 (2010). The IRS failed to assert and prove transferee of transferee liability. *Id.* at \*10. The IRS did not appeal that decision.

On July 11, 2008, the IRS issued notices of transferee liability against each of the Diebold children's foundations for the $33 million that each foundation received from the original Diebold Foundation. The IRS asserted that the Diebold Foundation was a transferee of Double-D and that the three successor foundations were in turn transferees of the Diebold Foundation. The three foundations contested the notices, and the Tax Court consolidated their petitions. The parties agreed to use the same evidence, including trial testimony, that was used in the earlier case against Dorothy Diebold.

The Tax Court determined that the original Diebold Foundation was not liable as a transferee of Double-D because the Double-D shareholders lacked actual or constructive knowledge under New York state law of Shap's fraudulent tax avoidance scheme. The Tax Court held that because the Diebold Foundation was not liable as a transferee of Double-D, the successor foundations could not be liable as transferees of a transferee. The IRS now appeals the Tax Court's decision in favor of Salus Mundi.

## STANDARD OF REVIEW

"The United States Courts of Appeals . . . shall have exclusive jurisdiction to review the decisions of the Tax Court . . . in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury . . . ." 26 U.S.C. § 7482(a)(1). "Thus, we review the tax court's conclusions of law de novo and its factual findings for

clear error." *DHL Corp. & Subsidiaries v. Comm'r*, 285 F.3d 1210, 1216 (9th Cir. 2002).

## DISCUSSION

### A. Two-Pronged Test for Liability Under 26 U.S.C. § 6901

Section 6901 of the Internal Revenue Code allows the IRS to assess tax liability against the transferee of assets of a taxpayer who owes income tax. 26 U.S.C. § 6901(a)(1)(A)(I). Transferee liability is "subject to the same provisions and limitations" as the original tax liability, *id.* § 6901(a), and includes liability of a "transferee of a transferee." *Id.* § 6901(c)(2). A "transferee" includes a "donee, heir, legatee, devisee, [or] distributee." *Id.* § 6901(h). Treasury regulations further provide that "the term 'transferee' includes . . . the shareholder of a dissolved corporation, . . . the successor of a corporation, . . . and all other classes of distributees." 26 C.F.R. § 301.6901-1(b).

In 1958, the Supreme Court held that this section "neither creates nor defines a substantive liability but provides merely a new procedure by which the Government may collect taxes." *Comm'r v. Stern*, 357 U.S. 39, 42 (1958). Because the section is "purely a procedural statute," the Supreme Court looked to state law to define "the existence and extent" of "substantive liability." *Id.* at 44–45. The result is a two-pronged inquiry for assessment of transferee liability: (1) is the party a "transferee" under § 6901 and federal tax law?; and (2) is the party substantively liable for the transferor's unpaid taxes under state law? *See Diebold*, 736 F.3d at 184–85; *Frank Sawyer Trust of May 1992 v. Comm'r*, 712 F.3d 597, 605 (1st Cir. 2013); *Starnes v. Comm'r*,

680 F.3d 417, 428 (4th Cir. 2012).  Salus Mundi and the IRS agree on the applicability of this two-pronged test but dispute the relationship between the two prongs and the proper outcome in the case.

The IRS argues that the two prongs are not independent. Rather, a court must first undertake the inquiry under § 6901 and federal tax law to determine transferee status and, if necessary, recharacterize transactions under the "substance over form" doctrine.  The IRS argues that the series of transactions between the Double-D shareholders, Shap, Toplands Farm, and Morgan Stanley should be recharacterized and Double-D deemed to have sold its assets and distributed the proceeds to its shareholders.  Under the IRS's interpretation, the federal law recharacterization is antecedent to the state law liability prong, and a court should apply state substantive law to the recharacterized transaction.

Salus Mundi counters that the inquiries are independent so the failure to satisfy either prong prevents the assessment of liability.  In Salus Mundi's view, the state law inquiry is separate from the determination of transferee status under § 6901 and any recharacterization of the transactions must rely on state law.

The Tax Court agreed with Salus Mundi's interpretation and stated that "[t]he law of the State where the transfer occurred (in these cases, New York) controls the characterization of the transaction."  "Under the [New York Uniform Fraudulent Conveyance Act], a party seeking to recharacterize a transaction must show that the transferee had 'actual or constructive knowledge of the entire scheme that renders [its] exchange with the debtor fraudulent.'" *Diebold*, 736 F.3d at 184–85 (quoting *HBE Leasing Corp. v. Frank*,

48 F.3d 623, 635 (2d Cir. 1995)).  The Tax Court found that the Double-D shareholders lacked actual or constructive knowledge of Shap's tax avoidance scheme and therefore refused to recharacterize the transactions under New York law.

The IRS's argument that "state law liability is assessed based upon the transaction as recharacterized by federal tax law" has recently been considered and rejected by three circuits.  *See Diebold*, 736 F.3d at 184–85; *Frank Sawyer Trust*, 712 F.3d at 605; *Starnes*, 680 F.3d at 428.

The IRS relies on the dissent in the Fourth Circuit's decision in *Starnes* as well as an older case from the Second Circuit, *Rowen*, as support for its position.  *See Starnes*, 680 F.3d at 440–46 (Wynn, J., dissenting); *Rowen v. Comm'r*, 215 F.2d 641, 643 (2d Cir. 1954).  The IRS cites to a passage in *Rowen* that uses the transferee determination under § 6901 as the starting point for the state law inquiry.  *Id.*  But this decision predated the Supreme Court's decision in *Stern*; when the Second Circuit revisited this issue in *Diebold*, it squarely rejected the IRS's argument.  736 F.3d at 185.  The Second Circuit held that "the position urged by the IRS imports federal law into the substantive determination of liability, in contravention of long settled law that § 6901is only a procedural statute, creating no new liability." *Id.* (citing *Stern*, 357 U.S. at 42).

The IRS, citing the dissent in *Starnes*, contends that the Supreme Court in *Stern* did not foreclose its interpretation of the two-pronged inquiry under § 6901.  The IRS points out that the Kentucky law at issue in *Stern* precluded tax liability regardless of transferee status so the Supreme Court did not address whether determination of transferee status under

§ 6901 is a threshold inquiry.  The dissent in *Starnes* argued that the analysis is different when presented with a transaction where "[state] law may indeed impose liability on the former shareholders, but *only if* there was a fraudulent transfer and they are transferees under federal law."  *Starnes*, 680 F.3d at 441 (citation omitted).  The *Starnes* dissent also argued that holding the two prongs to be independent "would allow state substantive law to redefine" potential transferees "in clear contravention" of the specific definition provided in § 6901(h).  *Id.* at 442 n.3.

The IRS and the *Starnes* dissent present a plausible characterization of *Stern.*  And there are plausible policy rationales for using the federal doctrine of substance over form to provide for liability against "a transparent scam designed by the parties to fraudulently evade paying taxes." *Id.* at 441.  But every circuit to directly address the issue has found that *Stern* is best interpreted as establishing that the state law substantive liability inquiry is independent of the federal law procedural inquiry, and we agree.  *See, e.g.*, *id.* at 429 ("An alleged transferee's substantive liability for another taxpayer's unpaid taxes is purely a question of state law, without an antecedent federal-law recasting of the disputed transactions.").

The IRS's arguments are not sufficiently persuasive to create an inter-circuit conflict.  *See Beecher v. Comm'r*, 481 F.3d 717, 720 (9th Cir. 2007) ("As a general rule, the tax decisions of other circuits should be followed unless they are demonstrably erroneous or there appear cogent reasons for rejecting them.").  Therefore, we conclude that "the two prongs of § 6901 are 'independent requirements, one procedural and governed by federal law, the other substantive

and governed by state law.'" *Diebold*, 736 F.3d at 186 (quoting *Starnes*, 680 F.3d at 427).

### B. The Second Circuit's Decision in *Diebold Foundation v. Commissioner*

Because the Diebold children's foundations were organized in Arizona, Connecticut, and South Carolina, the Tax Court's decisions in their favor were appealable to the Ninth, Second, and Fourth Circuits, respectively. The IRS did not appeal the decision in favor of the Ceres Foundation to the Fourth Circuit. But the IRS did appeal the decision in favor of the successor Diebold Foundation to the Second Circuit. *See Diebold*, 736 F.3d at 172.

The Second Circuit concluded that under New York law, the Double-D shareholders had constructive knowledge of the tax avoidance scheme and were therefore liable under state law; the Second Circuit vacated the Tax Court's decision and remanded to the Tax Court to determine transferee status under federal law and the applicable statute of limitations. *Id.* at 190. In reaching that conclusion, the court reasoned that the following facts, among others, showed a failure of ordinary diligence and active avoidance of the truth by the shareholders: (1) the shareholders' recognition of the "problem" of the "tax liability arising from the built-in gains on the assets held by Double-D"; (2) the shareholders' "sophisticated understanding of the structure of the entire transaction," including Shap's plans to immediately sell Double-D's assets; and (3) the shareholders' knowledge that Shap "had just come into existence for the purposes of the transaction" and thus "did not have the assets to meet its obligation to buy equivalent shares on the open market for

delivery to Morgan Stanley or pay Morgan Stanley an equivalent sum in cash." *Id.* at 187–89.

We have held that "absent a strong reason to do so, we will not create a direct conflict with other circuits." *United States v. Chavez-Vernaza*, 844 F.2d 1368, 1374 (9th Cir. 1987). "As a general rule, the tax decisions of other circuits should be followed unless they are demonstrably erroneous or there appear cogent reasons for rejecting them." *Beecher*, 481 F.3d at 720. The Second Circuit's decision in *Diebold Foundation* addressed the same facts, issues, and applicable law at issue in this appeal. While the question of the shareholders' constructive knowledge is a difficult issue, we conclude that the Second Circuit's decision is not demonstrably erroneous. Accordingly, we adopt the reasoning of that opinion on the state law inquiry and conclude that the shareholders had constructive knowledge of the tax avoidance scheme and made a fraudulent conveyance under New York law. *See Diebold*, 736 F.3d at 190; N.Y. Debt. & Cred. Law § 273.

In short, we conclude that the two prongs of § 6901 are separate and independent; an alleged transferee's substantive liability is determined solely with reference to state law, without any threshold requirement that the disputed transactions be recast under federal law. We also conclude that the shareholders' conduct shows that they had constructive knowledge of the fraudulent scheme; we therefore collapse the series of transactions and hold that the state law liability prong of the 26 U.S.C. § 6901 inquiry was satisfied in this case. We remand to the Tax Court to determine in the first instance: (1) Salus Mundi's status as a transferee of a transferee under the federal law inquiry of

26 U.S.C. § 6901; and (2) whether the IRS assessed liability within the applicable limitations period.

## CONCLUSION

The Tax Court's decision in favor of Salus Mundi is hereby **REVERSED**, and the case is **REMANDED** to the Tax Court for further proceedings consistent with this opinion.