T.C. Memo. 2016-115

UNITED STATES TAX COURT

NORMA L. SLONE, TRANSFEREE, ET AL.,[1] Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent*

Docket Nos.  6629-10, 6630-10,             Filed June 13, 2016.
             6631-10, 6632-10.

Stephen Edward Silver, Derek Kaczmarek, and Jason M. Silver, for

petitioners.

John Wayne Duncan, for respondent.

_____

[1]Cases of the following petitioners are consolidated herewith:  Slone Family
GST Trust, UA Dated August 6, 1998, Transferee, D. Jack Roberts, Trustee,
docket No. 6630-10; James C. Slone, Transferee, docket No. 6631-10; and Slone
Revocable Trust, UA Dated September 20, 1994, Transferee, James C. Slone and
Norma L. Slone, Trustees, docket No. 6632-10.

*This opinion supplements our previously filed opinion Slone v.
Commissioner, T.C. Memo. 2012-57.

[*2]                 SUPPLEMENTAL MEMORANDUM OPINION

HAINES, Judge:  These cases are before us on remand from the U.S. Court of  Appeals for the Ninth Circuit in accordance with its opinion in Slone v. Commissioner, 810 F.3d 599 (9th Cir. 2015), vacating and remanding T.C. Memo. 2012-57 (Slone I).  At our request, the parties filed supplemental briefs in which they were to address the issues raised by the Court of Appeals.  The parties have agreed that these cases may be decided on remand on the basis of the evidence submitted at the original trial.  Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## Background

We incorporate herein by this reference the facts that we found in Slone I, set forth under the heading FINDINGS OF FACT in that opinion.  These facts are based upon the stipulations of fact and this Court's credibility findings as to each witness appearing before it.  We summarize pertinent facts and portions of our opinion in Slone I for the benefit of the reader.

Slone Broadcasting operated several radio stations in Tucson.  In 2001 and 2002 Slone Broadcasting was a C corporation with a tax year ending June 30.

[*3] Slone Broadcasting had two shareholders, the Slone Revocable Trust and the Slone Family GST Trust (Slone GST Trust). Both trusts were formed pursuant to the laws of Arizona. James C. Slone and Norma L. Slone were the trustees of the Slone Revocable Trust and the grantors of the Slone GST Trust, an irrevocable trust.

John Barkley was the sole trustee of the Slone GST Trust from its inception. He is a licensed fiduciary in the State of Arizona. He hires accountants, lawyers, stockbrokers, and other professionals to aid him in carrying out his duties which are defined, in these cases, by the documents that established the Slone GST Trust. He exercises his authority independently from Mr. and Mrs. Slone.

On July 2, 2001, Slone Broadcasting sold its assets to Citadel Broadcasting Co. (Citadel) for $45 million, which resulted in an estimated combined Federal and State income tax liability of approximately $15 million. Mr. Slone's accountant, D. Jack Roberts, a certified public accountant with over 30 years of experience, advised on the accounting aspects of the transaction, and Tom Chandler, Slone Broadcasting's attorney, advised on the legal aspects of the transaction. Neither of the advisers proposed tax strategies to reduce the Federal and State income taxes resulting from the sale.

**[*4]**   After the closing of the asset sale, Slone Broadcasting did not conduct any business.  There were no plans to liquidate the corporation at any time, nor were there any plans to make distributions to its shareholders.  On October 15, 2001, Slone Broadcasting made its first estimated Federal income tax payment of $3,100,000 to the Internal Revenue Service (IRS) for its tax year ended (TYE) June 30, 2002.

Fortrend International, LLC (Fortrend), sent an unsolicited letter and brochure to Mr. Roberts on June 29, 2001.  The letter described Fortrend as a "private investment/merchant-banking group" seeking opportunities to acquire corporations in situations where the "assets of the Target Corporation can be profitably sold and/or leased to one or more purchasers/lessees".  The letter also stated that Fortrend was able to "structure transactions that help manage or resolve liabilities at the corporate level".  Mr. Roberts did not review the letter and company brochure until after the closing of the asset sale.

On August 8, 2001, Fortrend sent Mr. Roberts a second letter expressing Fortrend's continued interest in purchasing Slone Broadcasting's stock.  It described Fortrend's relationship with MidCoast Credit Corp. (MidCoast), a corporation engaged in the business of collecting delinquent credit card debt acquired from banks.  After receiving the second letter, Mr. Roberts informed Mr.

**[*5]** Slone, in general, about Fortrend and MidCoast and the proposal to buy Slone Broadcasting's stock. Mr. Slone gave Mr. Roberts permission to investigate further and to proceed if the transaction looked viable. On September 7, 2001, Fortrend sent a third letter to Mr. Roberts, attaching the Fortrend/MidCoast business plan together with financial projections.

Mr. Roberts hired Steven Phillips, a tax attorney, as counsel to advise Mr. and Mrs. Slone and the Slone Revocable Trust on any Fortrend proposals. Mr. Phillips was not involved in, and did not provide any legal advice with respect to, the asset sale. On September 10, 2001, Mr. Phillips met with Mr. Slone to discuss the proposed transaction. This meeting was Mr. Slone's only contact with Mr. Phillips. Mr. Roberts represented Mr. Slone in all other communications with Mr. Phillips.

Mr. Roberts provided the Fortrend/MidCoast business plan to Mr. Phillips for review. Mr. Phillips contacted a broker in the asset recovery business to inquire about MidCoast's reputation. The broker informed Mr. Phillips that MidCoast played an active role in the asset recovery industry and had a reputation as an aggressive but legitimate collector. Mr. Phillips reviewed the projections in the Fortrend/MidCoast business plan and concluded that they were reasonable. The reputations of Fortrend and MidCoast together with those of their attorneys

[*6] and accountant advisers were good. There was no reason for Mr. Roberts or Mr. Phillips to suspect any impropriety.

Mr. Roberts and Mr. Phillips knew that Fortrend had a strategy to reduce the income tax due as a result of the asset sale. When they asked Fortrend what actions would be taken to achieve the tax savings, they were told that Fortrend's methods could not be disclosed because they were "proprietary". However, Fortrend represented that Berlinetta, Inc. (Berlinetta), an entity created by Fortrend that would acquire the shares, had not engaged in any transaction that would be deemed a "listed transaction" pursuant to Notice 2001-51, 2001-2 C.B. 190. Mr. Phillips negotiated an increase in the purchase price for the stock based upon what he described as a "premium" payment resulting from the tax savings that Berlinetta anticipated. When negotiations concluded, the parties agreed to a purchase price of $35,753,000 plus Berlinetta's assumption of Slone Broadcasting's Federal and State income taxes owed as of the closing date.

As trustee of the Slone GST Trust, Mr. Barkley hired Greg Gadarian, another tax attorney independent from Mr. Phillips, to advise the Slone GST Trust with respect to any Fortrend proposals. On November 21, 2001, Mr. Phillips wrote a memorandum describing Fortrend's plan to offset the gains from the asset sale by contributing high basis/low value assets to Berlinetta in a section 351

[*7] transaction and selling those assets at a loss before the end of 2001. The memorandum also provided a legal analysis of the transferee liability considerations facing Slone Broadcasting's shareholders and concluded that they would not be exposed to such liability. Mr. Gadarian reviewed Mr. Phillips' memorandum and performed his own research. Mr. Gadarian agreed with Mr. Phillips' conclusions. Mr. Gadarian had no reason to think that the stock sale transaction was other than a legitimate sale. He therefore orally advised Mr. Barkley that there were no material legal obstacles to the proposed transaction. Soon after, Mr. Barkley approved the transaction on behalf of the Slone GST Trust. Both Mr. Phillips and Mr. Gadarian were aware of Notice 2001-16, 2001-1 C.B. 730, and both concluded that it did not apply.

On December 3, 2001, Mr. Phillips informed Mr. Roberts that there were no legal obstacles to proceeding. Mr. Roberts advised Mr. Slone that both Mr. Phillips and Mr. Gadarian had analyzed the legal implications of the transaction and concluded that it could proceed.

On December 10, 2001, Slone Broadcasting entered into the stock sale agreement with Berlinetta. Slone Broadcasting had no involvement in the financing. The stock sale agreement restricted the use of funds held in Slone Broadcasting's bank account until 10 days after the closing date.

**[*8]**  At the stock sale closing the Slone Revocable Trust and the Slone GST Trust received $30,819,544 and $2,550,456 in cash, respectively.  Mr. Slone and his children resigned as the officers and directors of Slone Broadcasting.  Slone Broadcasting did not make any distributions to its shareholders between the closing date of the asset sale and the closing date of the stock sale.  After the stock sale was closed petitioners had no knowledge or say in the operation of Slone Broadcasting.

Two days after the closing of the stock sale, on December 12, 2001, Slone Broadcasting merged with Berlinetta, with Slone Broadcasting as the surviving corporation.  Because the right to use the name "Slone Broadcasting" was not part of the sale, on January 17, 2002, Slone Broadcasting changed its name to Arizona Media.

The IRS began its examination of Arizona Media's TYE June 30, 2002, in March 2005.  On April 14, 2008, Arizona Media submitted Form 870-AD, Offer to Waive Restrictions on Assessment and Collection of Tax Deficiency and to Accept Overassessment, to the IRS, accepting a deficiency for its TYE June 30, 2002.  Arizona Media failed to pay the assessed tax, penalty, and interest.  No moneys were ever collected from Arizona Media.  On August 28, 2009, Arizona

**[\*9]** Media was administratively dissolved for failure to file its annual report with the State of Arizona.

On December 22, 2009, respondent issued transferee liability notices to the Slone Revocable Trust and the Slone GST Trust, determining that the trusts were liable for $16,193,881 and $2,550,832, respectively, plus interest, as transferees of assets, for the unpaid liability of Arizona Media for its TYE June 30, 2002. Additionally, respondent issued separate transferee liability notices to Mr. and Mrs. Slone individually, determining each liable under a transferee liability theory for $16,193,881, plus interest, for the unpaid liability of Arizona Media. Petitioners timely filed their petitions.

In Slone I we determined that the stock sale was a legitimate transaction and that the form of the transaction must be respected such that petitioners were not transferees under section 6901 for Federal tax purposes. Therefore, we determined that petitioners were not liable for the income tax liability accepted by Arizona Media on April 14, 2008.

Discussion

The Court of Appeals remanded these cases to us in order for us to make necessary findings to apply the test set forth in Commissioner v. Stern, 357 U.S. 39 (1958). Stern requires the satisfaction of a two-pronged test in order for a tax

**[\*10]** liability to be imposed on a transferee pursuant to section 6901. Id. at 44-45. The first prong is satisfied if the party is a "transferee" under section 6901 and Federal tax law. The second prong is satisfied if the party is "substantively liable for the transferor's unpaid taxes under state law". Salus Mundi Found. v. Commissioner, 776 F.3d 1010, 1018 (9th Cir. 2014), rev'g and remanding T.C. Memo. 2012-61. Both prongs must be satisfied in order for liability to be imposed on a transferee. See Commissioner v. Stern, 357 U.S. at 44-45. Respondent has the burden of proving that petitioners are liable as transferees, but he does not have the burden of proving that the taxpayer is liable for the tax. See sec. 6902(a); Rule 142(d).

On remand, the Court of Appeals instructed this Court to apply the tests set out in Stern, stating:

> Under the first prong of this test, the tax court should apply the relevant subjective and objective factors to determine whether the Commissioner erred in disregarding the form of the transaction in order to impose tax liability on the shareholders as "transferees" under § 6901. Under the second prong of the Stern test, the tax court should analyze whether the shareholders are liable under state law for Sloan Broadcasting/Arizona Media's unpaid tax liability. See Salus Mundi, 776 F.3d at 1018, 1020. The tax court may begin its analysis with either prong. The Commissioner may hold the shareholders liable as "transferees" under § 6901 only if both prongs of the Stern test are satisfied. See id.

**[\*11]** <u>Slone v. Commissioner</u>, 810 F.3d at 608 (fn. ref. omitted). The prongs "are separate and independent inquiries." <u>Id.</u> at 605 (quoting <u>Salus Mundi Found. v. Commissioner</u>, 776 F.3d at 1012).

As instructed by the Court of Appeals, we may begin our analysis with either prong. Therefore, we will address the second prong to determine whether petitioners are "substantively liable for the transferor's unpaid taxes under state law". <u>See</u> <u>Salus Mundi Found. v. Commissioner</u>, 776 F.3d at 1018.

I. <u>State Law Prong</u>

We must apply Arizona law because that is the State where the transfer occurred. <u>Estate of Miller v. Commissioner</u>, 42 T.C. 593, 598 (1964). Arizona enacted the Uniform Fraudulent Transfer Act (UFTA) in 1990, and it outlines when a transfer is fraudulent for State law purposes. <u>Hullet v. Cousin</u>, 63 P.3d 1029, 1032 (Ariz. 2003). The UFTA is codified at Ariz. Rev. Stat. Ann. secs. 44-1001 to 1010 (2013), and is "based upon the uniform act promulgated by the National Conference of Commissioners on Uniform State Laws in 1984. * * * The UFTA replaced Arizona's Uniform Fraudulent Conveyance Act ('UFCA') * * *. Like the UFCA, the UFTA's purpose is to protect creditors." <u>Hullet</u>, 63 P.3d at 1032.

**[*12]**  A.  The Form of the Stock Sale

Respondent argues that the form of the stock sale should be disregarded and treated as a liquidating distribution for purposes of applying the UFTA. Petitioners, however, argue that the form of the stock sale should be respected. Where a decision involves State law, we "must apply State law in the manner that the highest court of the State has indicated that it would apply the law."  Swords Trust v. Commissioner, 142 T.C. 317, 342 (2014).  If the State's highest court has not weighed in on the matter, we "must predict how the highest state court would decide the issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance."  Vestar Dev. II, LLC v. Gen. Dynamics Corp., 249 F.3d 958, 960 (9th Cir. 2001) (quoting Lewis v. Tel. Emps. Credit Union, 87 F.3d 1537, 1545 (9th Cir. 1996)).

Arizona has not provided a specific test to determine when the doctrine of substance over form will be used to recast a transaction for purposes of the UFTA. However, unless specifically displaced by its provisions, the principles of law and equity supplement the UFTA.  Ariz. Rev. Stat. Ann. sec. 44-1010.  Accordingly, we must look to other cases that have applied the substance over form doctrine in similar situations.  See Alterman Trust v. Commissioner, T.C. Memo. 2015-231.

[*13] In order for the stock sale to be recast as a liquidating distribution, respondent must prove that petitioners had actual or constructive knowledge of the entire scheme. See id. at *48 ("[I]n order to 'render the initial transferee's exchange with a debtor fraudulent, that transferee must have had either actual or constructive knowledge of the entire scheme.'" (quoting Starnes v. Commissioner, T.C. Memo. 2011-63, slip op. at 24)). We find that respondent did not sustain his burden of proof as to either actual or constructive knowledge.

1. Actual Knowledge

Mrs. Slone was not involved in the business and was simply a signatory to the sale documents. We hold that she did not have actual knowledge.

Mr. Roberts advised Mr. Slone of Fortrend and MidCoast's proposal to purchase Slone Broadcasting's stock, and Mr. Slone authorized Mr. Roberts to investigate the transaction. Mr. Roberts hired Mr. Phillips to advise Mr. Slone on proposals from Fortrend, and Mr. Slone met with Mr. Phillips to discuss the stock sale on one occasion. Mr. Slone relied on his advisers' expertise and had no involvement in vetting the legitimacy of the transaction or negotiating its terms. We hold that Mr. Slone did not have actual knowledge of the scheme that Fortrend/Berlinetta planned to use to avoid paying Slone Broadcasting's tax liability.

**[\*14]** Mr. Roberts and Mr. Phillips knew that Fortrend planned to take steps to reduce the amount of income tax due as a result of the asset sale but were stonewalled when they asked about the strategy Berlinetta planned to use. They were told that these methods were "proprietary" and could not be revealed. We hold that, like Mr. and Mrs. Slone, that Mr. Roberts and Mr. Phillips did not have actual knowledge of the scheme that Fortrend/Berlinetta planned to employ in order to avoid payment of Slone Broadcasting's income tax liability.

Mr. Barkley and Mr. Gadarian similarly lacked actual knowledge of Fortrend/Berlinetta's scheme. Mr. Gadarian reviewed a memorandum prepared by Mr. Phillips, performed his own research, and advised Mr. Barkley that there were no material legal issues in proceeding with the stock sale. We hold that Mr. Gadarian and Mr. Barkley had no actual knowledge of Fortrend/Berlinetta's tax avoidance scheme.

### 2. Constructive Knowledge

Constructive knowledge exists when, on the basis of the circumstances, the transferee should have known about the entire scheme. Diebold Found., Inc. v. Commissioner, 736 F.3d 172 (2d Cir. 2013), vacating and remanding Salus Mundi Found. v. Commissioner, T.C. Memo. 2012-61; HBE Leasing v. Frank, 48 F.3d 623, 636 (2d Cir. 1995). It also exists in situations where transferees "were aware

[*15] of circumstances that should have led them to inquire further into the circumstances of the transaction, but * * * [they] failed to make such inquiry." Diebold Found., Inc. v. Commissioner, 736 F.3d at 187 (quoting HBE Leasing, 48 F.3d at 636).

As noted above, Mrs. Slone had no involvement in the stock sale other than signing documents. Mr. Slone relied on Mr. Roberts and Mr. Phillips to advise him regarding the transaction's propriety. Mr. Slone credibly testified at trial that because he lacked the knowledge to determine whether it would be "all right" to sell the Slone Broadcasting stock, he hired individuals with the requisite expertise to advise him. He had no ownership interest and had resigned all positions in the corporation at the time the stock sale closed. We hold that Mr. and Mrs. Slone did not have constructive knowledge of Fortrend's tax avoidance scheme.

Mr. Roberts and Mr. Phillips were aware that Fortrend had a strategy to reduce the income tax that would be due as a result of the asset sale. They made a reasonable inquiry as to the actions Berlinetta would take to achieve the tax savings and were told that Fortrend's methods were "proprietary" and could not be disclosed. But Fortrend did represent that Berlinetta had not engaged in any transactions that would be deemed a listed transaction pursuant to Notice 2001-51,

[*16] supra.  Petitioners' advisers similarly lacked constructive knowledge of Fortrend/Berlinetta's scheme.

Mr. Gadarian, another independent tax attorney, was hired to advise the Slone GST Trust with respect to any Fortrend proposals.  Mr. Gadarian concluded that there was no reason to think that Fortrend was involved in any impropriety.

Petitioners' advisers' due diligence confirmed that MidCoast was a legitimate player in the debt recovery business known for its "hardball" collection tactics.  MidCoast and Fortrend were represented by reputable law and accounting firms.

Mr. Phillips' memorandum to Mr. Gadarian dated November 21, 2001, explains Fortrend's plan to offset the gains from the asset sale by contributing high basis/low value assets to Berlinetta in a section 351 transaction and selling those assets at a loss before the end of 2001.  This information was insufficient to give petitioners' advisers knowledge of Fortrend's scheme.  As we have acknowledged in other cases:  "[T]here are legitimate tax planning strategies involving built-in gains and losses and * * * it was not unreasonable, in the absence of contradictory information, for the representatives to believe that the buyer had a legitimate tax planning method."  Alterman Trust v. Commissioner, at *58 (quoting Swords Trust v. Commissioner, 142 T.C. at 349).

[*17] Petitioners and their advisers had no reason to believe that Fortrend's strategies were other than legitimate tax planning methods. We hold that the form of the stock sale must be respected because petitioners and their advisers did not have actual or constructive knowledge of Fortrend's tax strategies before or after the closing of the stock sale transaction.

### B. Application of the UFTA to the Stock Sale

Now that we have determined that the form of the stock sale must be respected, we will apply the UFTA to the transaction to determine whether petitioners may be held substantively liable for Slone Broadcasting's unpaid taxes under Arizona law. Respondent asserts that petitioners are liable under the constructive fraud provisions found in Ariz. Rev. Stat. Ann. secs. 44-1004(A)(2) and 44-1005 and for actual fraud under Ariz. Rev. Stat. Ann. sec. 44-1004(A)(1). We will address each in turn.

For purposes of the UFTA, a "creditor" is defined as a person who has a right to payment, and a "debtor" is a person who is liable for making the payment. Id. sec. 44-1001(2), (3), (5). A transfer is broadly defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset and includes payment of money, release, lease and creation of a lien or other encumbrance." Id. sec. 44-1001(9).

**[*18]**        1.  <u>Ariz. Rev. Stat. Ann. Sec. 44-1004(A)(2)</u>

Ariz. Rev. Stat. Ann. sec. 44-1004(A)(2) provides that a transfer made by a debtor is fraudulent as to a creditor

> if the debtor made the transfer * * * without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:  (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.  (b) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

This is true regardless of whether the creditor's claim arose before or after the transfer was made.  <u>Id.</u>

In these cases the IRS was the creditor and Slone Broadcasting was the debtor.  When petitioners sold their Slone Broadcasting shares, the consideration they received was from Berlinetta, not from Slone Broadcasting.  In fact, no consideration was received from Slone Broadcasting because the form of the stock sale transaction must be respected.  Because no transfer was made by Slone Broadcasting--the debtor--as a result of the stock sale, we hold there was no constructive fraud pursuant to Ariz. Rev. Stat. Ann. sec. 44-1004(A)(2).  <u>See</u> <u>Alterman Trust v. Commissioner</u>, at *65 ("The IRS is a creditor of AC, but the AC shareholders did not receive transfers from AC when they sold their stock to the MidCoast acquisition vehicles.").

**[*19]**        2. <u>Ariz. Rev. Stat. Ann. Sec. 44-1005</u>

The UFTA includes another constructive fraud provision. A transfer by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the debtor made the transfer without receiving reasonably equivalent value in exchange and was insolvent at that time or became insolvent as a result of the transfer. Ariz. Rev. Stat. Ann. sec. 44-1005.

As noted above, the stock sale resulted in Berlinetta's making transfers to petitioners, not Slone Broadcasting's. Because there were no transfers made by Slone Broadcasting, the debtor, we hold that Ariz. Rev. Stat. Ann. sec. 44-1005 cannot be applied to the stock sale. See <u>Alterman Trust v. Commissioner</u>, at *67 ("AC did not make any transfers to petitioners in the stock sale to the MidCoast acquisition vehicles.").

        3. <u>Ariz. Rev. Stat. Ann. Sec. 44-1004(A)(1)</u>

The UFTA also has an actual fraud provision. A transfer by a debtor is fraudulent as to a creditor, regardless of whether the creditor's claim arose before or after the transfer was made, if the debtor made the transfer "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor." Ariz. Rev. Stat. Ann. sec. 44-1004(A)(1). Ariz. Rev. Stat. Ann. sec. 44-1004(B) sets forth the following 11 factors that may be considered when determining whether actual intent exists:

[*20] 1. The transfer or obligation was to an insider.
2. The debtor retained possession or control of the property transferred after the transfer.
3. The transfer or obligation was disclosed or concealed.
4. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit.
5. The transfer was of substantially all of the debtor's assets.
6. The debtor absconded.
7. The debtor removed or concealed assets.
8. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.
9. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred.
10. The transfer occurred shortly before or shortly after a substantial debt was incurred.
11. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

There is no dispute that 5 of the 11 factors are not present in these cases.

We hold that the debtor, Slone Broadcasting: (1) did not retain possession or control of the transferred property after the stock sale; (2) did not conceal the stock sale; (3) had not been sued or threatened with suit before the stock sale; (4) did not abscond; and (5) did not transfer the essential assets of the business to a lienor who transferred the assets to one of its insiders. Respondent argues, however, factors 1, 5, 7, 8, 9, and 10 do apply to these cases. We will address each in turn.

**[*21]**         a. Factor 1:  Transfer to an Insider

Respondent argues that Slone Broadcasting's assets were transferred to insiders.  This argument fails because we have held that the form of the stock sale must be respected.  Petitioners sold their stock in Slone Broadcasting to Berlinetta in exchange for cash, and there was no transfer of Slone Broadcasting's assets to petitioners.  This factor does not weigh in favor of finding actual fraud under the UFTA.

b. Factor 5:  Transfer of Substantially All Assets

Respondent alleges that the cash petitioners received in exchange for their shares constituted a liquidating distribution of substantially all of Slone Broadcasting's assets.  We disagree because the form of the stock sale must be respected.  Petitioners received cash from Berlinetta in exchange for their Slone Broadcasting shares.  They did not receive a transfer of substantially all of Slone Broadcasting's assets.  This factor does not weigh in favor of finding actual fraud under the UFTA.

c. Factor 7:  Debtor Removed or Concealed Assets

Respondent asserts that petitioners removed Slone Broadcasting's assets because they received, in substance, a liquidating distribution in exchange for their stock in a de facto liquidation.  Because we have held that the form of the stock

[*22] sale must be respected, we disagree. The transfer at issue in these cases, the stock sale, did not result in a removal of Slone Broadcasting's assets. Petitioners are not responsible for Berlinetta's actions that occurred after the closing of the stock sale. This factor does not weigh in favor of finding actual fraud under the UFTA.

#### d. Factor 8: Value of Consideration Debtor Received Reasonably Equivalent to Value of Asset Transferred

Respondent alleges that Slone Broadcasting did not receive consideration in exchange for the transfer of its assets. Because we have held that the form of the stock sale must be respected, we disagree. Petitioners received cash from Berlinetta in exchange for their Slone Broadcasting shares. Slone Broadcasting did not surrender any assets or receive any consideration in connection with the stock sale. This factor does not weigh in favor of finding actual fraud under the UFTA.

#### e. Factor 9: Debtor Insolvent or Became Insolvent Shortly After Transfer Was Made

For purposes of the UFTA, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." Ariz. Rev. Stat. Ann. sec. 44-1002(A). Debtors that are not generally paying their debts as they come due are presumed to be insolvent. Id. sec. 44-1002(B).

[*23] Slone Broadcasting's assets exceeded its debts at the closing date of the stock sale. Slone Broadcasting paid $3.1 million as an estimated payment towards its Federal income tax liability before the closing of the stock sale. Respondent did not prove that the sum of Slone Broadcasting/Arizona Media's debts was greater than all of Slone Broadcasting/Arizona Media's assets at a fair valuation. Nor did he prove that Slone Broadcasting/Arizona Media was not paying its debts as they came due. Arizona Media's Federal income tax liability was in dispute until it became fixed on April 14, 2008, when it submitted a Form 870-AD, Offer to Waive Restrictions on Assessment and Collection of Tax Deficiency and to Accept Overassessment, accepting a deficiency for its TYE June 30, 2002. Accordingly, respondent has not met his burden of proof to show that at the time of the stock sale, or shortly thereafter, Slone Broadcasting/Arizona Media was insolvent. This factor does not weigh in favor of finding actual fraud under the UFTA.

### f. Factor 10: Transfer Occurred Shortly Before or Shortly After Substantial Debt Was Incurred

Respondent argues that the stock sale occurred shortly after the sale of Slone Broadcasting's assets, which gave rise to substantial debt--its tax liabilities. The UFTA defines "debt" as a liability on a claim, and the term "claim" is broadly

**[*24]** defined to mean a right to payment, even if contingent, unmatured and unsecured. Id. sec. 44-1001(2), (4). The sale of Slone Broadcasting's assets to Citadel on July 2, 2001, resulted in an estimated combined Federal and State income tax liability of approximately $15 million. Approximately five months later, at the time of the stock sale, Slone Broadcasting had a debt for the presumed tax due from the asset sale. This factor does not persuade us to hold that there was actual fraud under the UFTA.

Our evaluation of the factors set forth in the UFTA leads us to conclude that there was no actual fraud, and we so hold.

II. Conclusion

On the basis of the above analysis, we hold that the State law prong of the Stern test has not been satisfied. Satisfaction of both prongs of the Stern test is necessary in order for respondent to prevail in these cases. See Slone v. Commissioner, 810 F.3d at 608 ("The Commissioner may hold the shareholders liable as 'transferees' under § 6901 only if both prongs of the Stern test are satisfied."). Because we have held that the State law prong of the Stern test has not been satisfied, it is not necessary for us to analyze the Federal law prong of the test.

**[*25]** In reaching our decision, we have considered all arguments, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decisions will be entered for petitioners</u>.