# United States Tax Court

T.C. Memo. 2022-6

NORMA L. SLONE, TRANSFEREE, ET AL.,
Petitioners

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent[1]

––––––––––

Docket Nos. 6629-10, 6630-10,              Filed February 7, 2022.
6631-10, 6632-10.

––––––––––

*David R. Jojola*, *Stephen Edward Silver*, and *Derek W. Kaczmarek*, for petitioners.

*Arthur T. Catterall*, *Rachael J. Zepeda*, *William G. Bissell*, *Rick V. Hosler*, and *Doreen Marie Susi*, for respondent.

## SUPPLEMENTAL MEMORANDUM OPINION

LAUBER, *Judge*: These cases involve the assertion by the Internal Revenue Service (IRS or respondent) of transferee liability against petitioners as transferees of a corporation that was stripped of its assets and left unable to satisfy its Federal tax obligations. In *Slone III* this Court ruled that petitioners were not transferees under

––––––––––

[1] This opinion supplements our previously filed opinion *Slone v. Commissioner* (*Slone III*), T.C. Memo. 2016-115, 111 T.C.M. (CCH) 1556, *supplementing Slone v. Commissioner* (*Slone I*), T.C. Memo. 2012-57, *rev'd and remanded*, *Slone v. Commissioner* (*Slone II*), 810 F.3d 599 (9th Cir. 2015), *rev'd and remanded*, *Slone v. Commissioner* (*Slone IV*), 896 F.3d 1083 (9th Cir. 2018). Cases of the following petitioners are consolidated herewith: Slone Family GST Trust, UA Dated August 6, 1998, Transferee, D. Jack Roberts, Trustee, docket No. 6630-10; James C. Slone, Transferee, docket No. 6631-10; Slone Revocable Trust, UA Dated September 20, 1994, Transferee, James C. Slone and Norma L. Slone, Trustees, docket No. 6632-10.

[*2] the Arizona Uniform Fraudulent Transfer Act (Arizona UFTA) and section 6901.[2] In July 2018, reversing our Court for the second time, the U.S. Court of Appeals for the Ninth Circuit held that petitioners are liable for the transferor corporation's tax obligations. *Slone IV*, 896 F.3d at 1088. The IRS has calculated these numbers to include a deficiency of $13,494,884, an accuracy-related penalty of $2,698,997, and interest of $8,559,729, for a total of $24,753,610. The Ninth Circuit remanded the cases "for entry of judgment in favor of the Commissioner." *Ibid.* We accordingly directed that decisions would be entered under Rule 155.

The parties have submitted dueling Rule 155 computations. They agree that the transferor corporation's total tax liability is $24,753,610. But they disagree as to the extent to which petitioners are liable for this debt. Petitioners contend that they are not liable for the penalty or "pre-notice" interest, that the IRS has "double counted" the transfers, and that they are entitled to reductions for "equitable recoupment." Finding no merit in the arguments petitioners tender in support of their computations, we will enter decisions as requested by respondent.

*Background*

These cases grow out of a stock-sale transaction commonly known as an "intermediary company" or "Midco" transaction. Midco transactions, a type of tax shelter, were widely promoted during the late 1990s and early 2000s. Fortrend International, LLC (Fortrend), which engineered the deal here, was a leading promoter of Midco transactions. It has been involved in numerous cases previously considered by this Court.[3] In Notice 2001-16, 2001-1 C.B. 730, *clarified by* Notice 2008-111, 2008-51 I.R.B. 1299, the IRS listed Midco transactions as "reportable transactions" for Federal income tax purposes.

---

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3] *See Tricarichi v. Commissioner* (*Tricarichi I*), T.C. Memo. 2015-201, 110 T.C.M. (CCH) 370, *supplemented by Tricarichi v. Commissioner* (*Tricarichi II*), T.C. Memo. 2016-132, 112 T.C.M. (CCH) 33, *aff'd*, *Tricarichi v. Commissioner* (*Tricarichi III*), 752 F. App'x 455 (9th Cir. 2018), *and Tricarichi v. Commissioner* (*Tricarichi IV*), 908 F.3d 588 (9th Cir. 2018); *Salus Mundi Found. v. Commissioner*, T.C. Memo. 2012-61, *rev'd and remanded*, 776 F.3d 1010 (9th Cir. 2014), *and vacated and remanded sub nom. Diebold Found., Inc. v. Commissioner*, 736 F.3d 172 (2d Cir. 2013); *Frank Sawyer Tr. of May 1992 v. Commissioner*, T.C. Memo. 2011-298, *rev'd and remanded*, 712 F.3d 597 (1st Cir. 2013).

**[*3]**   Although Midco tax shelters took various forms, they shared several key features.  These transactions were chiefly promoted to shareholders of closely held C corporations that had large built-in gains.  The shareholders, while happy about the gains, were typically unhappy about the tax consequences.  They faced the prospect of paying two levels of income tax on these gains: the usual corporate-level tax, followed by a shareholder-level tax when the gains were distributed to them as dividends or liquidating distributions.  And this problem could not be avoided by selling the shares.  Any rational buyer would insist on a discount to the purchase price equal to the built-in tax liability that he would be acquiring.  *See Tricarichi I*, 110 T.C.M. (CCH) at 371.

Promoters of Midco transactions offered a purported solution to this problem.  An "intermediary company" affiliated with the promoter—typically a shell company, often organized offshore—would buy the shares of the target company.  The target's cash would transit through the Midco to the selling shareholders.  After acquiring the target's embedded tax liability, the Midco would engage in a sham transaction purporting to offset the target's realized gains and eliminate the corporate-level tax.  The promoter and the target's shareholders would agree to split the dollar value of the corporate tax thus avoided.  The promoter would keep as its fee a negotiated percentage of the avoided corporate tax.  The target's shareholders would keep the balance of the avoided corporate tax as a premium above the target's true net asset value (i.e., assets net of accrued tax liability).

In due course the IRS would audit the Midco, disallow the fictional losses, and assess the corporate-level tax.  But the Midco, having distributed its cash to the selling shareholders, would typically be asset-less and judgment-proof.  The IRS would then be forced "to seek payment from other parties involved in the transaction in order to satisfy the tax liability the transaction was created to avoid."  *Ibid.* (quoting *Diebold Found., Inc.*, 736 F.3d at 176).

The target company here was Slone Broadcasting Company (Slone Broadcasting), a now-defunct Arizona corporation.  It had two shareholders: the Slone Revocable Trust (Slone Trust) and the Slone Family GST Trust (GST Trust).  James Slone and Norma Slone were the trustees of the Slone Trust and the grantors of the GST Trust.

In 2001 Fortrend engineered a Midco transaction for petitioners.  Slone Broadcasting sold its assets to another broadcasting company for $45 million, generating a taxable gain of $38,598,926 and a combined

[*4] Federal and state tax liability of about $15,314,000. *See Slone I*, 103 T.C.M. (CCH) at 1266. The trusts then agreed to sell their Slone Broadcasting stock to a Fortrend affiliate (Berlinetta). At that point, Slone Broadcasting had a net asset value (taking account of its accrued tax liability) of less than $27 million. *Id.* at 1267. But Berlinetta agreed to pay the trusts for their stock roughly $29.8 million, plus assumption of all Federal and state tax liabilities. *Ibid.*; *see Slone IV*, 896 F.3d at 1084. Having no appreciable assets, Berlinetta for this purpose borrowed $30 million from Rabobank, a Dutch bank that facilitated many Midco transactions. *See Slone I*, 103 T.C.M. (CCH) at 1267; *see also Tricarichi I*, 110 T.C.M. (CCH) at 375 n.5.

At the closing on December 10, 2001, the Slone Trust and the GST Trust tendered their shares to Berlinetta and received cash totaling $30,819,544 and $2,550,456, respectively. *Slone I*, 103 T.C.M. (CCH) at 1268. The Slone Trust subsequently transferred $13,012,396 to Mr. Slone and $13,012,396 to Mrs. Slone.

On their joint Federal income tax return for 2001, Mr. and Mrs. Slone reported long-term capital gain of $32,765,826 from the stock sale. *Ibid.* (The Slone Trust did not file a Federal income tax return.) The GST Trust filed a Form 1041, U.S. Income Tax Return for Estates and Trusts, reporting long-term capital gain of $2,542,179 from the stock sale. The GST Trust was a grantor trust, *see* §§ 671–678, and this gain was likewise reported on the joint return filed by Mr. and Mrs. Slone as grantors, *see Slone I*, 103 T.C.M. (CCH) at 1268.

On December 12, 2001, two days after the stock sale closed, Slone Broadcasting merged with Berlinetta and changed its name to Arizona Media Holdings (AMH). *Ibid.* AMH used the proceeds of the asset sale to pay off Berlinetta's loan from Rabobank, leaving AMH a shell company with a large tax liability and essentially no assets. AMH engaged in a sham transaction that purported to eliminate its tax liability. *See Slone IV*, 896 F.3d at 1085; *Slone I*, 103 T.C.M. (CCH) at 1268. In July 2002 AMH filed a Form 1120, U.S. Corporation Income Tax Return, reporting a $37,885,260 gain from the asset sale and a loss of $38,039,573 from the sham transaction. *Slone I,* 103 T.C.M. (CCH) at 1268.[4]

---

[4] AMH filed this return on a fiscal year basis. Because the relevant transactions and transfers occurred in 2001, for convenience we will refer to this return as AMH's 2001 return.

[*5]   In March 2005 the IRS initiated an examination of AMH's 2001 return.  Following that examination AMH submitted a Form 870–AD, Offer to Waive Restrictions on Assessment and Collection of Tax Deficiency and to Accept Overassessment.  AMH, as Slone Broadcasting's successor, thereby accepted for 2001 a Federal income tax deficiency of $13,494,884 and an accuracy-related penalty of $2,698,997, for a total liability of $16,193,881 (plus accrued interest).

In May 2008 the IRS assessed that liability plus accrued interest.  Having no meaningful assets, AMH made no payments toward this debt.  In August 2009 AMH was dissolved by the Arizona secretary of state for failure to file its annual report.

Unable to collect the tax from AMH, the IRS initiated a transferee liability examination of petitioners.  On December 22, 2009, the IRS issued Letters 902–T, Notice of Liability, to the Slone Trust and the GST Trust, determining that they were liable, as transferees of Slone Broadcasting, for $16,193,881 and $2,550,832, respectively, plus accrued interest.  *See* § 6901(a).  The IRS issued separate notices of liability to Mr. and Mrs. Slone, as transferees of the transferees, determining that each was liable for $16,193,881, plus accrued interest.  *See* § 6901(c)(2).  Petitioners timely petitioned this Court, all residing in Arizona at that time.

Following the initial remand from the Ninth Circuit, this Court examined the Arizona UFTA to determine whether petitioners were liable as transferees.  *See Slone III*, 111 T.C.M. (CCH) at 1558.  Petitioners contended that the form of the transaction—i.e., a stock sale by the Trusts to Berlinetta—should be respected.  Respondent contended that the form of the transaction should be disregarded and that it should be "treated as a liquidating distribution [from Slone Broadcasting] for purposes of applying the [Arizona] UFTA."  *Ibid.*

This Court ruled that petitioners were not liable as transferees on the theory that "petitioners and their advisers did not have actual or constructive knowledge of Fortrend's tax strategies" for evading payment of Slone Broadcasting's tax debt.  *Id.* at 1559, 1560–61.  The Ninth Circuit again reversed, concluding that petitioners "were at the very least on constructive notice that the entire scheme had no purpose other than tax avoidance."  *Slone IV*, 896 F.3d at 1085.  The Ninth Circuit accordingly held that the transfer to petitioners was a "constructively fraudulent transfer under the Arizona UFTA" and that petitioners are thus "liable to the government for Slone Broadcasting's federal tax

**[\*6]** obligation as 'transferees' under 26 U.S.C. § 6901." *Id.* at 1088. The Ninth Circuit remanded the cases "for entry of judgment in favor of the Commissioner." *Ibid.*

In February 2019 we ordered the parties to file computations for entry of decision under Rule 155. The parties submitted competing computations and memoranda in support of their respective positions.

*Discussion*

A.    *Rule 155 Proceedings*

In cases such as these, where the substantive issues have been resolved (here by the Ninth Circuit), this Court normally directs that decisions will be entered under Rule 155. *See Vento v. Commissioner*, 152 T.C. 1, 7 (2019), *aff'd*, 836 F. App'x 607 (9th Cir. 2021). Rule 155 provides that, "[w]here the Court has filed . . . its opinion . . . determining the issues in a case, it may withhold entry of its decision for the purpose of permitting the parties to submit computations . . . showing the correct amount to be included in the decision." Rule 155(a). "Rule 155 computations are designed to ascertain the bottom-line tax effect of the determinations made in the Court's opinion." *Vento*, 152 T.C. at 7.

"If the parties' computations are not in agreement, the Court has discretion to afford them 'an opportunity to be heard in argument thereon.'" *Id.* at 7–8 (quoting Rule 155(b)). "Any argument under this Rule will be confined strictly to consideration of the correct computation of the amount to be included in the decision resulting from the findings and conclusions made by the Court . . . ." Rule 155(c). "A party may not use a Rule 155 computation to seek reconsideration of 'the issues or matters disposed of by the Court's findings and conclusions.'" *Vento*, 152 T.C. at 8 (quoting Rule 155(c)). And "no argument will be heard upon or consideration given . . . to any new issues." Rule 155(c); *see Vento*, 152 T.C. at 9 ("The Court rigorously enforces the bar against raising new issues in a Rule 155 proceeding.").

B.    *Analysis*

Section 6901 permits the Commissioner to assess a tax liability against a person who is "the transferee of assets of a taxpayer who owes income tax." *Salus Mundi Found.*, 776 F.3d at 1017. To impose this liability, a court must determine whether "the party [is] substantively liable for the transferor's unpaid taxes under state law" and whether that party is a "transferee" within the meaning of section 6901. *Slone II*,

**[\*7]** 810 F.3d at 604 (quoting *Salus Mundi Found.*, 776 F.3d at 1018). The Ninth Circuit resolved both of these questions in respondent's favor: It held that the transfers to petitioners were "constructively fraudulent transfer[s] under the Arizona UFTA" and that petitioners were "liable to the government for Slone Broadcasting's federal tax obligation as 'transferees' under 26 U.S.C. § 6901." *Slone IV*, 896 F.3d at 1088.

Because petitioners are "transferees" under section 6901, they are liable for Slone Broadcasting's tax liability "up to the limit of the amount transferred" to them. *See Schussel v. Werfel*, 758 F.3d 82, 93 (1st Cir. 2014), *aff'g in part, rev'g in part, and remanding* T.C. Memo. 2013-22. The parties agree that Slone Broadcasting's unpaid liability includes (among other things) a deficiency of $13,494,884. Mr. and Mrs. Slone each received $13,012,396, and the GST Trust received $2,550,456. Because the deficiency by itself exceeds each of these amounts, the IRS's recovery against these three transferees is capped at the value of the assets that each received.

However, the Slone Trust received $30,819,544, an amount that exceeds Slone Broadcasting's total liability of $24,753,610. Respondent thus contends that the Slone Trust is liable for the transferor's entire liability, including the deficiency, the accuracy-related penalty of $2,698,997, and pre-notice interest of $8,559,729. "Pre-notice interest" consists of interest that accrued on the deficiency and penalty under section 6601(a) between the due date of AMH's 2001 tax return and the date on which the notices of liability were mailed to petitioners.

Petitioners contend that the Slone Trust is liable only for the deficiency and post-notice interest, i.e., interest that accrued after the notices of liability were mailed to petitioners. They assert that the IRS is improperly "double counting" the transfers, seeking to recover an aggregate amount in excess of Slone Broadcasting's tax liability. And they contend that they are entitled to reductions for "equitable recoupment." We address these arguments in turn.

1. *Liability for Penalty*

Petitioners contend that the IRS is foreclosed from recovering any portion of the penalty because "claim[s] for penalties against the transferor . . . did not come into existence until long after the transfers

[*8] at issue." For this proposition they rely on *Stanko v. Commissioner*, 209 F.3d 1082 (8th Cir. 2000), *rev'g* T.C. Memo. 1996-530.

In *Stanko* the U.S. Court of Appeals for the Eighth Circuit interpreted Nebraska law in effect before 1989, when Nebraska adopted the UFTA. *See id.* at 1084 n.1. The court reasoned that "penalties for negligent or intentional misconduct by the transferor that occurred many months after the transfer . . . are not . . . existing at the time of the transfer." *Id.* at 1088. The Eighth Circuit concluded that "[a] creditor whose debt did not exist at the date of the . . . [transfer] cannot have the conveyance declared fraudulent unless he pleads and proves that the conveyance was made to defraud subsequent creditors whose debts were in contemplation at the time." *Id.* at 1087 (quoting *U.S. Nat'l Bank of Omaha v. Rupe*, 296 N.W.2d 474, 476 (Neb. 1980)).

We ruled in *Tricarichi I*, 110 T.C.M. (CCH) at 385, that the Eighth Circuit's reasoning in *Stanko* does not apply to cases where liability under state law is determined (as it is here) under the UFTA. In *Tricarichi I* that question was governed by Ohio's UFTA, which "differ[ed] from the pre-UFTA Nebraska statute that the Eighth Circuit was construing." *Ibid.* As we explained, the Ohio UFTA "define[d] 'claim' expansively to include any 'right to payment' even if it is 'unliquidated' and 'unmatured.'" *Ibid.* (quoting Ohio Rev. Code Ann. § 1336.01(C) (West 2003)). "The IRS may thus have a 'claim' for the penalties whether or not they are thought to have been 'existing at the time of the transfer.'" *Ibid.* (quoting *Stanko*, 209 F.3d at 1088). We noted that we had "reached the same conclusion concerning transferee liability for penalties under the fraudulent transfer laws of other States." *Ibid.* (citing cases). The Ninth Circuit, to which appeal of the instant cases would lie, affirmed our holding. *Tricarichi III*, 752 F. App'x 455.

Our analysis in *Tricarichi* fully applies here. Like the Ohio UFTA, the Arizona UFTA defines "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, un-liquidated, fixed, contingent, matured, unmatured, disputed, un-disputed, legal, equitable, secured or unsecured." Ariz. Rev. Stat. Ann. § 44-1001.2 (2021). The Supreme Court of Arizona has described this definition as "unquestionably broadly worded," ruling that it includes "unknown and unasserted claims." *Hullett v. Cousin*, 63 P.3d 1029, 1034 (Ariz. 2003). Thus, the Arizona UFTA supports transferee liability even if the penalty were thought to be an "unknown and unasserted claim" when the Slone Trust received the transfer.

**[\*9]** The Arizona UFTA, moreover, does not require proof that a transfer was made to defraud a specific existing creditor (such as the IRS). Even if the IRS's penalty claim were regarded as not being "in existence" on the date of the transfer, the Slone Trust would have transferee liability under section 44-1004(A)(2) of the Arizona UFTA. Under that provision, liability to future (as well as present) creditors exists if the transfer was made without the debtor's receiving "a reasonably equivalent value in exchange" and the debtor "intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." Ariz. Rev. Stat. Ann. § 44-1004(A)(2)(b); *see Slone IV*, 896 F.3d at 1086–87 (finding petitioners liable under Ariz. Rev. Stat. Ann. § 44-1004(A)(2)); *cf. Tricarichi I*, 110 T.C.M. (CCH) at 385 (holding to same effect under Ohio UFTA). For these reasons, we reject petitioners' argument that their transferee liability excludes the accuracy-related penalty.[5]

Finally, petitioners assert that they have no transferee liability for the penalty because respondent failed to meet his burden of production, which (they say) includes showing timely supervisory approval under section 6751(b)(1). This argument fails for at least two reasons. First, petitioners did not advance this argument at any point during the trial or appellate proceedings. Quite the contrary: AMH executed a Form 870–AD conceding liability for an accuracy-related penalty of $2,698,997. Petitioners' section 6751(b) argument is thus a "new issue" that "may not be raised in the context of a Rule 155 computation." *Vento*, 152 T.C. at 8.

Second, section 7491(c), which imposes a burden of production on respondent in certain circumstances, applies only in cases involving "the liability of any *individual* for any penalty." (Emphasis added.); *see Dynamo Holdings Ltd. P'ship v. Commissioner*, 150 T.C. 224, 230 (2018) ("[T]he Commissioner does not bear the burden of production with

---

[5] Petitioners err in relying on *Frank Sawyer Trust of May 1992 v. Commissioner*, T.C. Memo. 2014-128, 107 T.C.M. (CCH) 1621, 1624, where this Court cited *Stanko* in holding that a transferee was not liable for accuracy-related penalties assessed against the transferors. The facts of the instant cases, which must be evaluated under Arizona law, differ substantially from those of *Frank Sawyer Trust*, which involved Massachusetts law. The U.S. Court of Appeals for the First Circuit accepted our "factual finding that the Trust lacked knowledge—actual or constructive—of the new shareholders' tax avoidance intentions." *Frank Sawyer Tr. of May 1992*, 712 F.3d at 599. Here, by contrast, the Ninth Circuit has determined that petitioners had at least constructive knowledge that Slone Broadcasting's tax liabilities would not be satisfied. *Slone IV*, 896 F.3d at 1087–88.

[*10] respect to penalties in a corporate or partnership-level proceeding."). These cases involve the tax liability of Slone Broadcasting, a corporation. Although Mr. and Mrs. Slone are individuals, the IRS has not determined any distinct penalties against them, but rather has determined that they bear transferee liability for Slone Broadcasting's corporate tax debt.

### 2. *Liability for Pre-Notice Interest*

Petitioners next argue that they have no liability for pre-notice interest, i.e., interest that accrued on the corporate tax liability through December 22, 2009, when the IRS issued the notices of liability. Petitioners contend that pre-notice interest "is not recoverable against the transferees under Arizona state law." We addressed and rejected substantially the same argument in *Tricarichi II*.

As we explained in *Tricarichi II*, the law on this subject has been elaborated in a long line of cases dating back many decades. *Tricarichi II*, 112 T.C.M. (CCH) at 35 (citing *Cappellini v. Commissioner*, 16 B.T.A. 802 (1929)). Where "the value of the assets distributed to the transferee substantially exceed[s] the transferor's aggregate liability for deficiencies, penalties, and interest, the transferee's liability for interest is governed by, and must be computed in accordance with, the Internal Revenue Code." *Ibid.* (citing *Lowy v. Commissioner*, 35 T.C. 393, 397 (1960)). On the other hand, if the transferred assets are insufficient to satisfy the IRS's claim against the transferor, the IRS may have a further right to collect pre-notice interest from the transferee, based on the transferee's wrongful use of the transferred assets. "Th[is] latter right is one that is founded on State law, and it is only in such circumstances that it becomes appropriate to investigate State law" to determine the IRS's right to interest. *Ibid.* (quoting *Lowy*, 35 T.C. at 397).

In *Tricarichi II* we held that the IRS was entitled to recover pre-notice interest from the transferee, at the rate specified in section 6621, because the transferee "received assets with a value in excess of [the transferor's] total Federal tax liability (including pre-notice interest)." *Id.* at 36. On appeal the Ninth Circuit affirmed that holding. It ruled that, where the transferee receives assets with a value exceeding the transferor's liability, the "Internal Revenue Code determines pre-notice interest, and the availability of interest under state law is irrelevant." *Tricarichi IV*, 908 F.3d at 593.

**[\*11]** On this point the salient facts of these cases are the same as in *Tricarichi II*. The Slone Trust received cash totaling $30,819,544, but Slone Broadcasting's aggregate Federal tax liability was only $24,753,610. Because the Slone Trust received assets with a value that exceeded the transferor's total tax liability (including pre-notice interest), the Slone Trust's liability for interest is governed by Federal law, and the availability of interest under Arizona law is irrelevant. We thus hold that respondent is entitled to recover pre-notice interest as provided in sections 6601(a) and 6621. *See Tricarichi II*, 112 T.C.M. (CCH) at 36–37.[6]

### 3. *Alleged "Double Counting"*

Petitioners urge that the IRS is attempting to "double count" the transfers and "impose an aggregate transferee liability . . . that far exceeds" Slone Broadcasting's debt. Petitioners argue that, for section 6901 purposes, the assets deemed received by the Slone Trust should be reduced to $4,794,752—viz., the assets it actually received ($30,819,544) minus the assets it transferred to Mr. and Mrs. Slone ($26,024,792). But petitioners cite no authority, and we know of none, for the proposition that a transferee may reduce its liability by distributing the transferred assets to other persons. Indeed, such a rule would incentivize transferees to make a blizzard of subsequent transfers, hoping to frustrate IRS collection efforts.

"Transferee liability is several" under section 6901. *Alexander v. Commissioner*, 61 T.C. 278, 295 (1973); *Tricarichi I*, 110 T.C.M. (CCH) at 386. Petitioners are thus severally liable for Slone Broadcasting's tax debt (up to the value of the assets that each received). "[T]he fact that more than one person is responsible for a particular delinquency does not relieve another responsible person of her personal liability, nor can a responsible person avoid collection against herself on the ground that the Government should first collect the tax from someone else." *Woodley v. Commissioner*, T.C. Memo. 2017-242, 114 T.C.M. (CCH) 625, 628 (quoting *USLIFE Title Ins. Co. of Dallas v. Harbison*, 784 F.2d 1238,

---

[6] Petitioners challenge transferee liability for the pre-notice interest, as for the penalty, on the theory that "the claim for interest did not come into existence and begin to accrue until nine months after the transfer." But interest on a tax liability is not a claim that is different or separate from the underlying tax debt. Interest accrues automatically under Federal law, *see* § 6601(a), and it is simply part of the debt owed by the transferor-taxpayer to the IRS, *see Tricarichi IV*, 980 F.3d at 592. As explained in the text, the Internal Revenue Code, not Arizona law, determines the amount of the IRS's claim against the transferor.

**[*12]** 1243 (5th Cir. 1986)) (discussing joint and several liability under section 6672).

Of course, "the tax liability of the transferor can be collected only once." *Holmes v. Commissioner*, 47 T.C. 622, 627 (1967). Thus, the IRS may take no further collection action against any of the transferees once Slone Broadcasting's aggregate tax liability of $24,753,610 (plus post-notice interest) has been satisfied in full. But petitioners cannot reduce or eliminate the Slone Trust's liability for pre-notice interest and the accuracy-related penalty by insisting that the IRS must seek recovery from Mr. and Mrs. Slone instead. *See Morris v. Commissioner*, T.C. Memo. 2000-381, 80 T.C.M. (CCH) 886, 892.[7]

4.    *Equitable Recoupment*

Finally, petitioners urge that they are entitled to reduction of their transferee liability under the doctrine of "equitable recoupment." This entitlement, they contend, arises as a consequence of the Ninth Circuit's recharacterization of their stock-sale transaction as a liquidating distribution from Slone Broadcasting. Although petitioners may have a valid point, their claim for equitable recoupment is not yet ripe.

Petitioners treated the December 2001 transaction as a sale of stock to Berlinetta (the Fortrend affiliate), with Berlinetta assuming all of Slone Broadcasting's tax liabilities. Mr. and Mrs. Slone accordingly reported, on their 2001 joint tax return, long-term capital gain of $35,687,452. Virtually all of this gain, taxable at a 20% rate, was attributable to the Midco transaction.

As it turned out, the sale price that the Slones reported on their 2001 return was artificially high. That price reflected the assumption that Slone Broadcasting's tax liabilities would be paid by Berlinetta (or more likely, never be paid at all). That assumption, of course, was false. The Ninth Circuit disregarded the form of the transaction and recharacterized it as a liquidating distribution to petitioners, coupled with transferee liability whereby Slone Broadcasting's tax liabilities have now been charged to them. Given this turn of events, petitioners con-

---

[7] Respondent concedes that, once the transferor's liability has been fully satisfied, "then, as a matter of law, all liability of the transferees would be extinguished." As respondent notes, however, "it is unknown at this point which of the petitioners will choose to or be able to pay." The IRS is thus entitled to maintain its claims for several liability against all four transferees until Slone Broadcasting's aggregate Federal tax liability (plus post-notice interest) has been paid in full.

**[\*13]** tend that the capital gain reported on their 2001 return was exaggerated, creating the risk of inconsistent taxation.

To remedy this problem, the Slones have recomputed their 2001 tax liability by reducing their reported capital gain ($35,687,452) by the transferee liability imposed on them ($24,753,610), yielding a revised capital gain of $10,933,842. Making that substitution on their 2001 return, they calculate a "corrected" tax liability of $2,125,820, versus the $7,078,352 actually reported. The difference between those amounts, or $4,952,532, constitutes the amount of "equitable recoupment" to which they think they are entitled. Allocating that sum among the four petitioners, they contend that the transferee liability chargeable to them should be reduced as follows:[8]

| Transferee | Reduction |
|------------|-----------|
| Mr. Slone | $1,931,205 |
| Mrs. Slone | 1,931,205 |
| Slone Trust | 711,602 |
| GST Trust | 378,520 |
| **Total** | **$4,952,532** |

Equitable recoupment is an equitable remedy designed to prevent injustice "where the Government has taxed a single transaction, item, or taxable event under two inconsistent theories." *United States v. Dalm*, 494 U.S. 596, 605 n.5 (1990). Respondent does not dispute that this Court has jurisdiction to apply the doctrine. *See* § 6214(b). But the "basic requirement for equitable relief has always been the inadequacy of the remedy at law." *Estate of Stein v. Commissioner*, 37 T.C. 945, 956–57 (1962). Section 1341 appears to provide a legal remedy for the problem that petitioners have identified.

Section 1341 is captioned "Computation of Tax Where Taxpayer Restores Substantial Amount Held Under Claim of Right." It applies where (1) "an item was included in gross income for a prior taxable year . . . because it appeared that the taxpayer had an unrestricted right to such item," and (2) a deduction is allowable in a later year "because it was established after the close of such prior taxable year . . . that the taxpayer did not have an unrestricted right to such item or to a portion of such item." § 1341(a)(1) and (2). If these conditions are met, and if

---

[8] These allocations reflect the assumption, which we have rejected, that the Slone Trust's liability is reduced on account of its transfers to Mr. and Mrs. Slone. *See supra* pp. 11–12.

**[\*14]** the deduction exceeds \$3,000, the taxpayer's tax for the later year is reduced by taking account of this deduction. *See* § 1341(a)(3), (4), and (5).

We have repeatedly held that the remedy of equitable recoupment is not available when section 1341 provides an adequate remedy at law:

> [W]here a taxpayer has in [one] year received an amount from a corporation under a claim of right and paid a tax upon the receipt, he is not entitled to recover the tax paid in the prior year under a doctrine of equitable recoupment when it is later determined that he is liable as transferee for tax of the corporation making the distribution to him.

*Maynard Hosp., Inc. v. Commissioner*, 54 T.C. 1675, 1676 (1970); *see Estate of Stein*, 37 T.C. at 958 ("[E]quitable recoupment is unavailable in cases to which section 1341 applies."); *Delpit v. Commissioner*, T.C. Memo. 1992-297, 63 T.C.M. (CCH) 3053, 3054–55 (same), *supplementing* T.C. Memo. 1994-147.

Section 1341 thus "provides the appropriate remedy" where a transferee is "required to restore payments which he had received under a claim of right." *Maynard Hosp., Inc.*, 54 T.C. at 1676; *see Estate of Stein*, 37 T.C. at 957 (ruling that section 1341 provides "a remedy superior to and inclusive of equitable recoupment"); *Kardash v. Commissioner*, T.C. Memo. 2015-197, 110 T.C.M. (CCH) 353, 356 (same), *supplementing* T.C. Memo. 2015-51. A transferee must therefore pursue a claim under section 1341 before seeking equitable recoupment.

Petitioners do not now have an existing claim under section 1341. That section applies only if "a deduction is allowable" for the later year. § 1341(a)(2). Petitioners are cash basis taxpayers, and no deduction will be allowable on account of their transferee liability until they have paid the tax. *See Estate of Stein*, 37 T.C. at 957 (stating that relief is available "in the year of repayment"). We accordingly conclude that neither the doctrine of equitable recoupment nor petitioners' section 1341 claim is properly before us in these cases. After paying the tax, petitioners may pursue these forms of relief by filing claims for refund and (if their claims are denied) by commencing suit in district court, *see* 28 U.S.C.

**[\*15]** § 1346(a) (2018), or the U.S. Court of Federal Claims, *see id.* § 1491(a).[9]

To implement the foregoing,

*Decisions will be entered in accordance with respondent's computations.*

---

[9] If in a subsequent refund action petitioners are denied relief under section 1341, an equitable recoupment claim may then become available (so long as they meet the relevant requirements). *See Estate of Stein*, 37 T.C. at 956 n.10 (stating that "District Courts have permitted equitable recoupment" if section 1341 does not apply).